Filed 1/27/16

CERTIFIED FOR PUBLICATION


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Shasta)

----


| | |
|---|---|
| THE PEOPLE, | C072783 |
| Plaintiff and Respondent, | (Super. Ct. No. 10F7007) |
| v. | |
| DAVID EARL EWING, JR., | |
| Defendant and Appellant. | |


APPEAL from a judgment of the Superior Court of Shasta County, William D. Gallagher, Judge. Affirmed.

Robert Navarro, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Carlos A. Martinez, Catherine Tennant Nieto, Deputy Attorney General, for Plaintiff and Respondent.

Defendant David Earl Ewing, Jr., and three others were involved in a "drug-rip"--where the seller takes the buyer's money without ever handing over the drugs--gone bad. The victim was shot but survived, and defendant and his cohorts were caught trying to escape.

Defendant was convicted of multiple offenses and various enhancements, including--as alleged in count four of the information--that he shot at an occupied vehicle for the benefit of, at the direction of, or in association with a criminal street gang under Penal Code section 186.22, subdivision (b)(4). (Pen. Code, § 246; unless otherwise stated, statutory references that follow are to the Penal Code.) On appeal, defendant argues insufficient evidence supports the gang enhancement and that the People's gang expert improperly testified that defendant committed the crimes in order to promote or further a criminal street gang.

At oral argument, defendant also cited two additional cases that had been published since this matter was fully briefed. He argued, based on *People v. Prunty* (2015) 62 Cal.4th 59 (*Prunty*), that insufficient evidence establishes the existence of a "criminal street gang," a necessary element of section 186.22's substantive gang offense as well as its gang enhancement. (§ 186.22, subds. (a) & (b).) Although he did not specifically argue the point, defendant also briefly referenced *People v. Velasco* (2015) 235 Cal.App.4th 66, 78 (*Velasco*), which concluded that a conviction for actively participating in a criminal street gang requires proof that a defendant promoted felonious conduct by a member of his own gang rather than a member of another gang.

Addressing defendant's latter contentions first, we conclude sufficient evidence establishes the existence of a "criminal street gang" under *Prunty* and that defendant and his cohorts were members of the same gang under *Velasco*. We also find substantial evidence shows defendant committed the charged offenses for the benefit of the Norteno criminal street gang, and that even if the gang expert improperly testified regarding

2

defendant specifically, rather than hypothetically, any error was harmless on this record. We therefore affirm the judgment.

FACTS AND PROCEEDINGS

A.    <u>Robbery</u> <u>of</u> <u>Luis</u> <u>Cordova</u>

In the summer of 2010, several Norteno street gang members moved to Redding to try to establish a Norteno gang regiment in the area. One of those individuals was Giovanni Bergara. At the time, Bergara was a high ranking Norteno gang member in the Bay Area, and was known to some as a "shot caller." He had a tattoo of a Huelga bird on his arm, which he claimed he earned for killing someone.

Defendant met Bergara in the Bay Area, and knew that he was a Norteno gang member. Bergara told defendant about the meaning of his Huelga bird tattoo and also about several of his gang exploits.

In September 2010, defendant drove Bergara to Redding, where the two planned to steal marijuana plants together. When they arrived in Redding, defendant rented a motel room for them. Bergara had a Tech 9 assault weapon with him, and defendant handled the gun while at the motel. The two stole several marijuana plants from growers Bergara knew from previously having lived in Redding.

The next day Bergara spoke with Jessie Merkel, an associate of the Norteno street gang in Redding. Merkel was an admitted OxyContin addict. Merkel and his former girlfriend, Ashley Wright, who was also an OxyContin addict, had planned to rob a local drug dealer named Luis Cordova and enlisted Bergara to help. Wright had previously engaged in drug transactions with Cordova and she set up a phony deal to sell Cordova OxyContin pills.

That evening, Wright and Merkel met with Bergara and defendant outside defendant's motel room to discuss the plan to rob Cordova. They agreed that Wright would meet Cordova and drive with him to a certain location where defendant, Bergara,

3

and Merkel would be waiting in defendant's car. Wright would take Cordova's money and tell him she would return shortly with the drugs. Instead, she would get in defendant's waiting car and the group would drive away, leaving Cordova without his money and without any OxyContin pills.

Later that night, defendant drove Wright, Merkel, and Bergara to a nearby restaurant. Cordova arrived a few minutes later in his own car. At the restaurant, Wright got into Cordova's car. Wright directed Cordova to drive to a dark street and park in front of an empty house where defendant was waiting in his car with Bergara and Merkel. Defendant had parked up a long driveway, out of sight from the main road.

Cordova demanded to see the OxyContin pills before he would give Wright the money. She told Cordova she had to talk to her friends, and then got out of Cordova's car and walked over to defendant's car. Wright told the group that Cordova refused to give her the money without first seeing the drugs. She also said she thought Cordova had a gun.

Wright eventually returned to Cordova's car and got in the front passenger seat. She was accompanied by a man who got into the back seat behind Cordova. Wright told Cordova the man was her friend who had the OxyContin pills. At trial, the evidence conflicted over whether that man was defendant or Bergara.

Cordova handed nearly $1,200 to Wright and she began counting the money. The man in the back seat grabbed the money and pulled out a gun. He got out of the car and started shooting at Cordova. Wright rolled out of the car, and both she and the man hopped into defendant's car, which was driving by Cordova's vehicle. As defendant's car sped away, Cordova followed the group.

Bergara fired several shots at Cordova from the car window. Cordova realized he had been shot and eventually stopped following defendant's car and called police. He told the 911 dispatch officer that the shooter was either "a big heavy set . . . either Mexican or an Indian guy" who was wearing a dark shirt with money signs printed on it.

4

Wright advised the group of a short cut to the freeway, which turned out to be a dead end. Bergara then got out of the car and hid the gun. After he returned to the car, defendant drove towards the freeway. A passing officer later pulled them over and all four were arrested.

At the police station, defendant was seen urinating on his hands and wiping urine on his hands, face and neck. The officer who observed the behavior assumed, and defendant later confirmed, that he was trying to remove gunshot residue from his body.

Wright and Merkel helped police locate the gun, and were questioned and released. Wright had hidden the money in her pants and she and Merkel used it to purchase drugs. They voluntarily returned to the police station a few days later, and were subsequently arrested.

B.    Defendant's Police Interview

During a videotaped interview with police a few days after his arrest, which was shown to the jury, defendant told officers he knew Bergara was a high ranking Norteno gang member who claimed to have killed someone. He also knew Bergara's Huelga bird tattoo was an earned Norteno gang symbol. He knew Merkel was a gang associate of Bergara's, and he claimed that Wright was also associated with the gang. He denied being a gang member, however.

Several times during the interview defendant referred to stories Bergara had told him about his criminal exploits in an attempt to gain a higher "rank" in the gang. He told officers that Bergara said he recently killed someone in Redding, thereby earning the Huelga bird tattoo. He also said Bergara directed two other gang members to kill a Modesto "scrap," or Sureno gang member, and that Bergara said he was present when the killing occurred. Defendant said law enforcement eventually caught the two gang members who carried out the Modesto killing hiding in another Norteno gang member's

5

house in Redding. That Norteno gang member, according to defendant, was named Manny.

Defendant also told police how he and Bergara had originally gone to Redding to steal marijuana plants, and that later they met up with Merkel and Wright to discuss a plan to rob Cordova using a fake drug sale as a ruse. Together with Bergara and Merkel, he drove Wright to meet Cordova. He then drove Bergara and Merkel to the abandoned house where the fake drug deal was to take place. He saw Bergara's loaded gun in the car. He waited in the driver's seat, with Merkel in the backseat, while Bergara and Wright returned to Cordova's car after he refused to give Wright the money without first seeing the OxyContin pills. Defendant knew Bergara took the gun with him to Cordova's car.

A short time later, defendant heard gunshots and began driving away, picking up Bergara and Wright as he drove. Bergara began firing out defendant's car window and back towards Cordova, who was following them. He recounted how Wright had misdirected him to drive down a dead end, and how Bergara got out of the car to hide the gun. He then drove towards the freeway where the group was arrested a short time later.

Defendant admitted to being the getaway driver, but denied being the shooter. He acknowledged urinating on his hands and wiping it on his face and neck because Bergara told him it would remove gunshot residue. He denied holding the gun the night of the shooting, but admitted handling it the day before. He said the plan was never to shoot the victim, but rather simply to take his money and drive off.

C.     Trial Proceedings

A July 2012 amended information charged defendant with seven counts, including attempted murder (§§ 664/187; count one) with assault with a deadly weapon as a lesser included offense (§ 245), second degree robbery (§ 211; count two), assault with an assault weapon (§ 245, subd. (d)(3); count three) with an infliction of great bodily injury

6

allegation (§ 12022.7), shooting at an occupied motor vehicle (§ 246; count four), permitting a person to discharge a firearm from a vehicle (§ 12034, subd. (b); count five), conspiracy to commit grand theft (§§ 182, subd. (a)(1)/487; count six), and street terrorism (§ 186.22, subd. (a); count seven). Gang enhancements were attached to the assault weapon and shooting at an occupied vehicle counts. (§186.22, subd. (b).) It was also alleged that defendant was eligible for sentencing under California's three strikes law because he had a prior serious felony conviction. (§§ 667, subd. (a)(1) & 1170.12, subd. (a)(1).)

To show the crimes were gang related, the prosecution called an expert to testify about criminal street gangs. Special Agent Robert Marquez testified as the prosecution's gang expert. He had been employed by the California Department of Corrections for 26 years, and had been a special agent for the last eight years. Agent Marquez had been a gang investigator since 2001, and had received specialized training in Hispanic criminal street gangs. Over the course of his career, Agent Marquez had investigated and spoken with hundreds of gang members, including Norteno gang members.

Agent Marquez testified about the culture and habits of gangs, including the structure of the Norteno criminal street gang and how it originated from the Nuestra Familia prison gang. According to Agent Marquez, around 1955 Hispanic prison inmates in California formed the Mexican Mafia prison gang to promote their race. The prison gang's control extended to the streets since many street gang members eventually ended up in prison.

Due to perceived mistreatment, nearly a decade later some Mexican Mafia members broke away and formed two rival Hispanic prison gangs, one of which was known as Nuestra Familia. The Mexican Mafia and Nuestra Familia prison gangs essentially divided the State in half; territory in the northern part of the state fell under the authority of the Nuestra Familia prison gang, and territory in the southern part of the state

7

was controlled by the Mexican Mafia. The Nuestra Familia prison gang is the parent organization over all Norteno gang members.

In the mid-1980s, the Department of Corrections began identifying and segregating all prison gang members from the general prison population. As a result, the power and influence of the Nuestra Familia gang within prisons began to wane. To counter its decreased influence, the Nuestra Familia authorized the formation of another Norteno gang known as the Nuestra Raza and often referred to as the Northern Structure by prison officials. Nuestra Familia authorized the Northern Structure to operate on the prison general population yards and also to control the Norteno criminal street gang on the Nuestra Familia's behalf.

To help control Norteno criminal street gang members from prison, the Nuestra Familia prison gang issued the Northern Hispanic Street Regiment Rules (regimental rules), which Agent Marquez obtained a copy of in 2010 while serving a search warrant in another matter. The regimental rules represent the policies of the Nuestra Familia prison gang at Pelican Bay State Prison.

The regimental rules set forth individual rules and expectations for Norteno criminal street gangs, including that Nortenos are expected to generate finances for the Nuestra Familia prison gang. One approved method for generating money is doing drug-rips like the one here. One quarter of any money generated by Norteno criminal street gang members must be deposited in the prison accounts of Nuestra Familia gang members. Norteno criminal street gang members who stop producing money or fail to pay the mandated amount to the prison gang are targeted for assault or death.

Agent Marquez also testified that the regimental rules require Norteno criminal street gangs to identify a regiment leader, an assistant regiment leader, and three individuals in charge of finances, security, and weapons, respectively. They prohibit Nortenos from divulging information about the gang or its activities to anyone that is not a gang member or an associate of the gang.

8

According to Agent Marquez, all Norteno criminal street gang members are expected to operate pursuant to these regimental rules. Gang members who do not comply are punished.

In the summer of 2010, law enforcement in Shasta County became aware that several individuals from outside the county had moved to Redding to establish a Norteno criminal street gang regiment. Agent Marquez described how the individuals were "getting orders from Pelican Bay State Prison and the Nuestra Familia" that Redding was an "untapped resource, was not under the control of any specific gangs and [that] the Nuestra Familia wanted to establish their presence, their authority through the Norteno Street Gangs . . . ."

One such individual, Jacinto Valdovino, was a documented Northern Structure prison gang member as well as a documented Norteno criminal street gang member from Sacramento. Valdovino became the Redding Norteno regiment street commander on behalf of the Nuestra Familia. Waylon Rocha, another documented Norteno criminal street gang member from Sacramento also moved to Redding to help establish the Norteno criminal street gang regiment. Rocha organized a white street gang from the Westwood neighborhood into the Norteno criminal street gang. Bergara, with whom defendant was arrested, also moved into the area from Hayward to help in the effort.

Agent Marquez testified to the pattern offenses committed by Norteno gang members in Redding, including narcotics sales, human trafficking, drug-rips, assaults, homicides, and firearms offenses. He also testified about several individuals who were documented Norteno gang members in Redding and the predicate crimes for which they had been convicted.

The first predicate offense involved Justin Plympton, a documented Redding Norteno gang member who, at the direction of Valdovino--the regiment commander of the Redding Norteno criminal street gang--assaulted a rival Sureno gang member at a gas

station in Redding in 2010. Plympton was convicted of assault with force likely to cause great bodily injury and an attached criminal street gang allegation was found true.

The second and third predicate offenses were convictions for Valdovino himself. In 2010, Valdovino was convicted for the attempted murder and kidnapping of a Sureno gang member as well as discharging a firearm and participating in a criminal street gang, among other things. Valdovino was also convicted of vandalism in a separate case, which Agent Marquez testified was a pattern offense of the Norteno criminal street gang that often involved tagging private property with gang graffiti.

The fourth predicate offense involved a 2011 criminal threats conviction in Shasta County for Justin Burtner, a documented Norteno street gang member. The fifth and sixth predicate offenses were two Shasta County convictions for assault with force likely to cause great bodily injury committed by two Norteno/Westwood Boy gang members, Ryan Matthew Watson and Joseph Kenney.

Agent Marquez described for the jury the meaning of several Norteno gang symbols and gang tattoos, including the Huelga bird, the number 14, and a star. In the Norteno gang, a Huelga bird tattoo is "earned" by assaulting or killing rival gang members or informants. The number 14 represents the letter "N," the 14th letter of the alphabet. In gang culture, the number 114 is generally understood to mean 100 percent down for the number 14, the Nortenos. The Norteno gang has also adopted a star, particularly the Northern Star, as one of its symbols.

Agent Marquez was shown several photographs showing Bergara with other documented Redding Norteno gang members, including Valdovino and Rocha. In the pictures, Bergara is throwing Norteno gang signs and Valdovino is getting a tattoo from Manny Ortiz, another documented Norteno gang member.

When defendant was arrested, the trunk of his car had electrical tape on it in the shape of the number 114. Defendant also had a tattoo of a star on his neck. In Agent Marquez's opinion, the number 114 in electrical tape and the star tattoo were Norteno

10

gang symbols. Given the regimental rules, Agent Marquez further opined that Bergara would not have told defendant the meaning of his Huelga bird tattoo or about his criminal gang endeavors, nor would Bergara have brought defendant along to steal marijuana plants or drug-rip Cordova if defendant were not at least associated with the Norteno gang.

Based on his training and experience with Norteno gangs, defendant's star tattoo, the 114 taped on his car, and defendant's participation with Bergara, a documented Norteno gang member, in stealing marijuana plants and in robbing Cordova, both pattern offenses for Norteno gang members, Agent Marquez concluded defendant was an active participant in the Norteno criminal street gang. Asked to assume a hypothetical set of facts based on the evidence presented, Agent Marquez opined that the drug-rip and subsequent crimes were committed in association with or for the benefit of the Norteno street gang.

Wright and Merkel also testified for the prosecution. They accepted plea bargains in exchange for truthfully testifying against defendant. As part of his plea deal, Merkel pleaded guilty to committing a felony in furtherance of the Norteno street gang.

Wright and Merkel both testified that defendant got out of his car and followed Wright back to Cordova's car carrying a gun, claiming he would handle the situation. During an earlier police interview, Merkel said it was defendant and not Bergara who went to Cordova's car. Later, however, he said it was Bergara that accompanied Wright to Cordova's car and that defendant did not get out of his car during the incident. Merkel also testified he was an associate of the Norteno gang at the time.

Cordova testified that the person who shot him was heavyset and had either long hair or dreadlocks. He was wearing a shirt that had pictures of money bills all over it. After being shown a photograph of Bergara, Cordova identified him as the shooter and admitted that defendant did not look exactly like the man in the picture.

11

A jury convicted defendant of all charges and found the gang allegations to be true. However, the jury found that an infliction of great bodily injury enhancement alleged as to count three which itself alleged that defendant committed an assault with an assault weapon was not proven, apparently deciding that defendant committed that offense as an aider and abettor. Based on the "not true" finding for the great bodily injury allegation, defendant moved to dismiss the section 186.22 subdivision (b)(1)(c) gang enhancement also alleged for count three, which the court granted.

In a subsequent bifurcated proceeding, the court found true the allegation that defendant had suffered a prior serious or violent felony strike conviction. Defendant was sentenced to an aggregate indeterminate term of 35 years to life, calculated as follows: 15 years to life for shooting at an occupied vehicle in count four, doubled under section 1170.12, plus five years under section 667, subdivision (a)(1) for his prior serious felony conviction; a concurrent 12 years for assault with an assault weapon in count three, doubled; two years and four months, doubled, for attempted murder plus one year for the armed with a firearm enhancement in count one; one year, doubled, for second degree robbery in count two; eight months, doubled, for permitting a person to discharge a firearm from a motor vehicle in count five; eight months, doubled, for conspiracy to commit grand theft in count six; and eight months, doubled, for street terrorism in count seven. (§§ 1170.12, 667, subd. (a).) The court stayed the sentences on counts one through three and counts five through seven under section 654.

DISCUSSION

I

*Evidence of a Criminal Street Gang*

Citing the Supreme Court's recent decision in *Prunty*, *supra*, 62 Cal.4th 59, which was decided while defendant's appeal was pending, defendant claims insufficient evidence establishes a "criminal street gang" for purposes of the gang enhancement under

12

section 186.22, subdivision (b).  He therefore contends the gang enhancement must be reversed.  If defendant is correct, his conviction for actively participating in a criminal street gang under section 186.22, subdivision (a) must also be reversed as the substantive gang offense includes the same "criminal street gang" element.  (§ 186.22, subd. (a); *In re Jose P.* (2003) 106 Cal.App.4th 458 (*In re Jose*) ["The existence of a criminal street gang is unquestionably an element of both the enhancement and the substantive offense"], disapproved on other grounds in *Prunty, supra*, 62 Cal.4th at p. 78, fn.5.)

We disagree that *Prunty* governs the present facts.  But even if *Prunty* applies, we find sufficient evidence establishes the existence of a criminal street gang within the meaning of *Prunty*.

In reviewing a challenge to the sufficiency of evidence, we must " ' "review the whole record in the light most favorable to the judgment to determine whether it contains substantial evidence--i.e., evidence that is credible and of solid value--from which a rational trier of fact could have found the defendant guilty beyond a reasonable doubt." ' " (*People v. Hill* (1998) 17 Cal.4th 800, 848.)  We may not reweigh the evidence or substitute our judgment for that of the trier of fact.  (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.)  "[O]ur opinion that the evidence could reasonably be reconciled with a finding of innocence or a lesser degree of crime does not warrant a reversal of the judgment." (*Hill, supra,* 17 Cal.4th at p. 849.)

" 'The test is whether substantial evidence supports the decision, not whether the evidence proves guilt beyond a reasonable doubt.' " (*People v. Romero* (2006) 140 Cal.App.4th 15, 18.)  " 'Conflicts and even testimony [that] is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends.  [Citation.]  We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence.  [Citation.]' " (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.)  Reversal for insufficient evidence is warranted

13

only where it clearly appears that upon no hypothesis whatever is there sufficient evidence to support a conviction. (*People v. Bolin* (1998) 18 Cal.4th 297, 331; *People v. Massie* (2006) 142 Cal.App.4th 365, 371.)

The substantive gang offense under section 186.22, subdivision (a) provides, "[a]ny person who actively participates in any criminal street gang with knowledge that its members engage in or have engaged in a pattern of criminal gang activity, and who willfully promotes, furthers, or assists in any felonious criminal conduct by members of that gang, shall be punished [as specified]." (§ 186.22, subd. (a).) The gang enhancement imposes additional punishment for felony convictions "committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members . . . ." (§ 186.22, subd. (b).)

Section 186.22, subdivision (f) defines "criminal street gang" as "any 'ongoing organization, association, or group of three or more persons' that shares a common name or common identifying symbol; that has as one of its 'primary activities' the commission of certain enumerated offenses; and 'whose members individually or collectively' have committed or attempted to commit certain predicate offenses." (Prunty, *supra*, 62 Cal.4th at p. 67; see also § 186.22, subd. (f).) The Supreme Court construed the definition of a "criminal street gang" under section 186.22, subdivision (f) in *Prunty*. (*Prunty* at pp. 70-71.)

*Prunty* considered the proof necessary to establish the existence of a "criminal street gang" when the prosecution's theory turns on the conduct of one or more gang subsets. (*Prunty, supra,* 62 Cal.4th at p. 67.) The case thus appears limited to a discrete factual scenario. (*Id.* at p. 91, conc. & disn. opn. of Corrigan, J.) Indeed, according to Justice Corrigan's concurring and dissenting opinion, *Prunty* addresses only the proof necessary to establish the existence of a "criminal street gang" when the "prosecution seeks to prove a street gang enhancement by showing the defendant committed a felony

14

to benefit a broader umbrella gang, but seeks to prove the requisite pattern of criminal gang activity with evidence of felonies committed by members of subsets to the umbrella gang." (*Ibid.*; but see *id.* at p. 71, fn. 2, maj. opn. of Cuellar, J. ["The rule we describe in this case applies to all STEP Act cases where the prosecution's theory of why a criminal street gang exists turns on the conduct of one or more gang subsets, not simply to those in which the prosecution alleges the existence of 'a broader umbrella gang' "].)

That was not the prosecution's theory here. Instead, the prosecution contended defendant was actively participating or associating with the Norteno criminal street gang, and more specifically, with the Norteno gang regiment that was being established in Redding around the time of the charged offenses. The prosecution offered several predicate offenses of other Norteno gang members who were helping to set up the same Norteno gang regiment, including two predicate offenses committed by Valdovino, the regiment leader. Arguably, then, *Prunty* does not apply to the factual scenario presented here as the prosecution did not proffer the predicate crimes of subset gang members to prove the existence of a criminal street gang. But even assuming for sake of argument that *Prunty* does apply, we conclude the evidence presented below sufficiently established the existence of a criminal street gang under *Prunty*.

The defendant in *Prunty* identified as Norteno and specifically claimed the Detroit Boulevard set of the Nortenos as his own. (*Prunty, supra,* 62 Cal.4th at pp. 67-68.) He had shot at a perceived rival gang member at a Sacramento shopping center while uttering gang slurs and yelling the word "Norte." (*Ibid.*) The prosecution sought to prove he committed the charged crimes to benefit the Sacramento-area Norteno street gang. (*Id.* at p. 67.)

To establish the gang enhancement, the prosecution's gang expert testified about the Sacramento-area Norteno gang's general existence and origins, its use of shared signs, symbols, colors, and names, its primary activities, and the predicate activities of two local neighborhood subsets, the Varrio Gardenland Nortenos and the Varrio Centro

15

Nortenos. (*Prunty, supra,* 62 Cal.4th at pp. 67, 69.) The gang expert, however, did not provide any specific testimony connecting the subsets' activities to one another or to the Sacramento Norteno gang in general. (*Id.* at p. 67.)

In reversing the gang enhancement for insufficient evidence, the Supreme Court found the prosecution failed to show a connection among the subsets it alleged comprised the criminal street gang. (*Prunty, supra,* 62 Cal.4th at p. 68; § 186.22, subd. (b).) "[W]here the prosecution's case positing the existence of a single 'criminal street gang' for purposes of section 186.22(f) turns on the existence and conduct of one or more gang subsets, then the prosecution must show some associational or organizational connection uniting those subsets." (*Prunty* at p. 71.)

The court explained that the necessary "connection may take the form of evidence of collaboration or organization, or the sharing of material information among the subsets of a larger group. Alternatively, it may be shown that the subsets are part of the same loosely hierarchical organization, even if the subsets themselves do not communicate or work together." (*Prunty, supra,* 62 Cal.4th at p. 71.) Evidence that "various subset members exhibit behavior showing their self-identification with a larger group" may also be sufficient to allow those subsets to be treated as a single organization. (*Ibid.*) However the "prosecution chooses to demonstrate that a relationship exists," (*id.* at p. 72), the evidence must show that "the gang the defendant sought to benefit, the individuals that the prosecution claims constitute an 'organization, association, or group,' and the group whose actions the prosecution alleges satisfy the 'primary activities' and predicate offense requirements of section 186.22(f), [are] one and the same." (*Id.* at pp. 75-76.)

*Prunty* provided several examples demonstrating how to establish the necessary connection between various subsets and an alleged larger gang for purposes of the gang enhancement. (*Prunty, supra,* 62 Cal.4th at p. 77.) For more formal groups, evidence showing shared bylaws or organizational arrangements, shot callers who answer to a

16

higher authority, or that the subsets routinely protect the same turf may prove the connection. (*Ibid.*)

In situations where a group's structure is more informal, evidence showing various subsets collaborate to accomplish shared goals, strategize to carry out activities, or profess or exhibit loyalty to one another would be sufficient to imply the existence of a genuinely shared venture. (*Prunty, supra,* 62 Cal.4th at pp. 78-79.) Evidence that gang subsets acknowledge one another as part of the same organization, coupled with evidence that the organization tends to operate in decentralized fashion in a relevant geographic area may also be sufficient. (*Id.* at p. 79.)

Applying this framework to the evidence presented in *Prunty*, the Supreme Court first found that the prosecution sufficiently proved that the Sacramento-area Nortenos engaged in illicit primary activities since Detective Sample had testified that " 'the Nortenos' in the area engage in various criminal practices, including homicide, assault, and firearms offenses." (*Prunty, supra,* 62 Cal.4th at p. 82.) We note that Agent Marquez provided similar testimony here regarding the Norteno criminal street gang, and specifically the Norteno street gang regiment that Nuestra Familia had directed Norteno gang members set up in Redding in 2010.

What the Supreme Court found lacking, however, was evidence regarding the necessary predicate offenses. (*Prunty, supra,* 62 Cal.4th at p. 82.) While the gang expert in *Prunty* referred to two offenses involving three alleged Norteno subsets, which he characterized as Nortenos, "he otherwise provided no evidence that could connect these groups to one another, or to an overarching Sacramento-area Norteno criminal street gang." (*Ibid.*) We find the evidence regarding predicate offenses in this case decidedly different than the evidence--or lack of evidence--proffered in *Prunty*. Expert gang testimony, coupled with other trial evidence, provided the required connection the Supreme Court found absent in *Prunty*.

17

Here, the prosecution's theory was that defendant actively participated or associated with the Norteno criminal street gang and sought to benefit that gang, particularly the Norteno criminal street gang regiment being set up in Redding. To support its theory, the prosecution presented the following evidence at trial:

The Nuestra Familia prison gang is the parent organization over all Nortenos. To exert its control and authority over the Norteno criminal street gang, the Nuestra Familia issued regimental rules outlining the types of crimes Nortenos were expected to commit to earn money for the prison gang. Such crimes included drug-rips, assaults, and attempted murders like the ones involved here. The regimental rules mandated that all Norteno criminal street gang members contribute one quarter of any money received through criminal endeavors on the street to Nuestra Familia gang members in prison. The rules also prohibited Norteno gang members from disclosing gang information to non-gang members or to individuals who did not associate with the gang.

In the summer of 2010, Nuestra Familia believed Redding was an untapped resource that was not controlled by any particular gang. It therefore wanted to establish its presence in Redding through the Norteno criminal street gang. On orders from Nuestra Familia in Pelican Bay State Prison, Norteno criminal street gang members from all over the state were sent to Redding to set up a Norteno street gang regiment in the city.

Agent Marquez testified that Valdovino, Bergara, and Rocha were among the documented Norteno gang members who moved to Redding to establish the Norteno gang regiment in the summer of 2010--only a few months before the crimes occurred in this case. While Agent Marquez testified that Valdovino and Rocha were from Sacramento and Bergara was from the Bay Area, no evidence showed they claimed any particular subset. Instead, the evidence was that they identified simply as Nortenos.

This evidence shows the relative formality and structure of the larger Nuestra Familia prison gang and the connection with the subordinate Norteno criminal street

18

gang. Members from the Norteno criminal street gang, such as Bergara and Valdovino, followed directives issued by the prison gang by moving to Redding to set up the Norteno street gang regiment. The regimental rules formulated by the prison gang also dictated sanctioned criminal activities, such as the drug-rips and attempted murder that Bergara and defendant committed here.

The predicate offenses offered at trial, moreover, were all committed by Norteno gang members from Redding. Three predicates involved crimes either ordered or committed by Valdovino, the Redding Norteno criminal street gang regiment commander. Setting aside, for a moment, that Valdovino's two convictions alone are sufficient to establish the pattern of criminal gang activity and predicate offense elements of the gang statute (§ 186.22, subds. (e) & (f)), even the other two predicates committed by the Norteno/Westwood Boys would likely suffice. That is because Agent Marquez testified that Rocha had helped organize a preexisting gang in the Westwood neighborhood into the Norteno regiment in Redding thereby linking all the predicate offenders together.

Photographic evidence introduced below also linked Bergara, Valdovino, and Rocha. In the pictures, Bergara is throwing Norteno gang signs, and Valdovino is getting a tattoo from Manny Ortiz, another documented Norteno gang member in Redding. The pictures also show Bergara and Rocha together.

Defendant himself admitted he knew Bergara had rank in the Norteno criminal street gang when he accompanied Bergara to Redding to steal marijuana plants. Bergara told defendant about crimes he had committed in Redding, including shooting or killing someone there to earn the Huelga bird tattoo. Defendant had knowledge of and told law enforcement about several other Norteno gang crimes that had been committed in Redding as well as a murder of a Sureno gang member in Modesto, which Bergara allegedly ordered. He also knew that the Norteno gang members responsible for the

19

Modesto murder had been arrested while hiding out at Manny's house in Redding. Law enforcement confirmed that defendant's information was accurate.

From this evidence a reasonable jury could have concluded that Nuestra Familia ordered the Norteno criminal street gang to set up a gang regiment in Redding, and that Bergara, Valdovino, and Rocha--all documented Norteno gang members--complied with the orders from their gang superiors. The jury also reasonably could have concluded that defendant knew Bergara was a high ranking Norteno who had committed heinous crimes in Redding and that he freely associated with him. Because the regimental rules, handed down by the Nuestra Familia gang to the Norteno criminal street gang, prohibited disclosing information to non-gang members, the jury also reasonably could have inferred that defendant was either a member of that gang or, at a minimum, associated with the Norteno criminal street gang in Redding as he had intimate knowledge regarding Norteno gang exploits there.

The photographic evidence, moreover, shows that the Redding Norteno gang members hung out together. This evidence demonstrates an associational loyalty to one another, and shows they engaged in common activities with one another, such as giving and receiving tattoos.

The totality of the evidence presented shows that the gang members who committed the predicate crimes were associated with each other, with the Norteno criminal street gang, and with the higher Nuestra Familia prison gang, which oversaw the criminal activities of the Norteno street gang through the regimental rules. The evidence further shows that through his association with Bergara defendant was also linked to the Norteno criminal street gang in Redding. This stands in stark contrast to the evidence in *Prunty*, where the gang expert simply "described the subsets by name, characterized them as Nortenos, and testified as to the alleged predicate offenses." (*Prunty, supra,* 62 Cal.4th at p. 83.)

20

As the Supreme Court emphasized in *Prunty*, "[t]he key is for the prosecution to present evidence supporting a fact finder's reasonable conclusion that multiple subsets are acting as a single 'organization, association, or group." (*Prunty, supra,* 62 Cal.4th at p. 80.)  We find the prosecution satisfied that burden here.

We also briefly address defendant's citation to *Velasco*, *supra*, 235 Cal.App.4th 66 prior to oral argument.  Although defendant mentioned the case in passing during argument, he did not elaborate in any meaningful way on the decision or how it applied to the present facts.

The court in *Velasco* interpreted section 186.22, subdivision (a) "as requiring the defendant to be acting with another member of the defendant's gang" to support a substantive gang conviction.  (*Velasco, supra,* 235 Cal.App.4th at p. 78.)  According to the court, "[i]t is not sufficient that the defendant act with a member of another gang, unless it is shown that those gangs are merely subsets of a primary gang and typically work together." (*Ibid.*)  The court ultimately found insufficient evidence supported the defendant's active gang participation conviction because the evidence showed defendant was a member of one gang and his accomplice was a member of a different gang with no other evidence linking the two gangs.  (*Id.* at pp. 77-78, fn.4.)  In short, no evidence showed the defendant committed any felonious act with another member of *his* criminal street gang.  (*Id.* at p. 78.)

In this case, by contrast, the record does not contain any evidence showing Bergara and defendant were members of two different gangs.  Rather, the evidence shows Bergara and defendant were associated with the same criminal street gang.

Defendant and Bergara were both from the Bay Area and often hung out together with several other Norteno gang members there.  Defendant was privy to key Norteno gang information regarding crimes not only Bergara had committed but other Norteno gang members as well, something Agent Marquez testified would not have happened

21

under the regimental rules unless defendant was a member of or at least associated with Bergara's gang. Both Bergara and defendant had tattoos symbolic of the Norteno criminal street gang. Defendant knew Bergara had previously lived in Redding, had claimed to have murdered someone in Redding, and had helped hide Norteno gang members in Redding after they carried out a murder in Modesto that Bergara ordered.

Defendant voluntarily drove Bergara to Redding and rented a hotel room for them. They planned to, and did, steal marijuana plants together. And, together with Merkel and Wright, they planned to, and did, drug-rip and attempt to kill Cordova. These were the types of crimes that the regimental rules said that Norteno criminal street gang members should commit in order to generate money for the Nuestra Familia prison gang. Defendant also believed Merkel was associated with Bergara's gang at the time, and Merkel pleaded guilty to the gang enhancement based on the events in this case.

Although defendant denied being a gang member, the jury was free to disregard this self-serving statement. It is well settled that a rational trier of fact may disbelieve those portions of a defendant's statements that are obviously self-serving. (*People v. Silva* (2001) 25 Cal.4th 345, 369.) Given defendant's conviction of the substantive gang offense and the jury's true finding on the gang enhancement, it is apparent the jury did not believe defendant's statement that he was not a Norteno criminal street gang member.

When viewing the evidence in the light most favorable to the judgment, as we must, we conclude the jury could reasonably conclude defendant and Bergara were members of the same criminal street gang. *Velasco*, then, is inapt.

II

*Sufficient Evidence Supports the Gang Enhancement*

Defendant argues the record is insufficient to support the jury's finding that he shot at an occupied vehicle "for the benefit of, at the direction of, or in association with

22

any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members." (§§ 186.22, subd. (b)(1), 246.) Because defendant denied he was a gang member and without evidence that the victim was a gang member or that anyone involved wore gang colors or used gang slogans, defendant argues the gang expert's testimony about gang culture was not sufficient to create an inference that the shooting was gang related. According to defendant, no reasonable trier of fact could find that the shooting and robbery were anything other than crimes committed by four drug users who were seeking to maintain their high. We disagree with defendant's view of the evidence and conclude substantial evidence supports the gang enhancement.

" 'To establish a gang enhancement allegation, the "prosecution must prove that the crime for which the defendant was convicted had been 'committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members.' " ' [Citation.]" (*People v. Miranda* (2011) 192 Cal.App.4th 398, 411 (*Miranda*).) "There is rarely direct evidence that a crime was committed for the benefit of a gang. For this reason, 'we routinely draw inferences about intent from the predictable results of action. . . . We can discover mental state only from how people act and what they say.' " (*Id.* at pp. 411-412.)

" 'Commission of a crime in concert with known gang members is substantial evidence which supports the inference that the defendant acted with the specific intent to promote, further or assist gang members in the commission of the crime.' " (*Miranda, supra,* 192 Cal.App.4th at p. 412.) In *People v. Morales* (2003) 112 Cal.App.4th 1176, 1179 (*Morales*), for example, the court found that "evidence that [the] defendant knowingly committed the charged crimes in association with two fellow gang members was sufficient to support the jury's findings on the gang enhancements that (a) the crimes were 'committed for the benefit of, at the direction of, or in association with' a gang, and (b) [the] defendant committed the crimes 'with the specific intent to promote, further, or

23

assist in any criminal conduct by gang members.' " (*Morales* at pp. 1179, 1198 ["very fact that defendant committed the charged crimes in association with fellow gang members" supports the gang enhancement].)

Here, substantial evidence supports the jury's true finding on the gang enhancement. Defendant admitted that he knew Bergara was a high ranking Norteno gang member, who claimed to have murdered someone, when he drove him up to Redding to steal marijuana. He rented a hotel room for both he and Bergara to stay in while they engaged in criminal activity. Defendant knew Bergara had an assault weapon with him, and defendant even handled the gun the day before the robbery. Defendant also admitted seeing the loaded gun in the car the night of the robbery and that he saw Bergara grab the gun before he accompanied Wright back to Cordova's car. A jury reasonably could have inferred that defendant knew Bergara was likely to use it during the commission of the robbery.

Defendant also admitted planning the robbery with Bergara, Wright, and Merkel, who he knew was an associate of the Norteno gang. He admitted driving the group to commit the crime and then driving the getaway car when trying to escape after Cordova had been shot and his money stolen.

Agent Marquez, moreover, testified that the Norteno street gang was trying to establish a stronghold in Redding at the time of the offense. Bergara had previously moved to the area to help in the effort. Agent Marquez opined that drug-rips and shootings associated with such criminal activity benefited the gang because the offenses not only help generate money for the gang, but also they create fear among rival gang members as well as the community, which makes it less likely victims or witnesses will report the crimes.

Defendant's argument that no gang signs or symbols were used during the crime, moreover, is arguably contrary to the evidence. Defendant had the number 114 in electrical tape on the trunk of his car, which he used in the robbery. The number 114 was

24

a known Norteno gang symbol that meant 100 percent down for the number 14, meaning the Norteno gang. That Agent Marquez acknowledged the tape could have simply been holding a defective trunk down or that it could have been in the shape of the number 144 goes to the weight of the evidence. The jury was free to reject the defendant's argument regarding the tape's meaning. (*Miranda, supra,* 192 Cal.App.4th at p. 407 [despite conflicting evidence, jury was entitled to credit testimony of one witness over other evidence].)

Defendant also had a star tattoo on his neck. In Agent Marquez's opinion, defendant's star tattoo was gang related. The fact that defendant's tattoo could have represented something other than a gang symbol again goes to the weight of the evidence. (*People v. Ochoa* (2001) 26 Cal.4th 398, 438 [although "187" tattoo could have highlighted defendant's connection to a gang subset rather than Penal Code section 187, which proscribes murder, the tattoo evidence was still admissible].)

This evidence, coupled with Agent Marquez's expert testimony, was sufficient to find the shooting gang related. When viewed in the light most favorable to the judgment, the evidence shows defendant agreed to help a high-ranking Norteno gang member and his associates rob Cordova using an assault weapon in a town where the Norteno gang was trying to establish a stronghold. That the evidence might also reasonably be reconciled with a contrary finding, as defendant argues, does not warrant reversal of the gang enhancement. (*People v. Ferraez* (2003) 112 Cal.App.4th 925, 931 [appellate court does not reweigh evidence or redetermine issues of credibility].)

Nor do the cases cited by defendant, in which the evidence was found insufficient to support a gang enhancement, compel a different conclusion. Those decisions are factually distinguishable.

In *In re Frank S.* (2006) 141 Cal.App.4th 1192, 1199, there was insufficient evidence to support a gang enhancement based on a finding that the minor carried a concealed dirk or dagger where the prosecution "did not present any evidence that the

minor was in gang territory, had gang members with him, or had any reason to expect to use the knife in a gang-related offense." Here, by contrast, defendant admitted to being with a Norteno gang member and Norteno gang associates and to committing crimes in an area where the Norteno gang was trying to establish a gang regiment. Defendant also knew Bergara had an assault weapon with him in Redding. As noted above, the jury could reasonably believe defendant knew Bergara had the firearm with him in the car and that the firearm would be used to force Cordova to give up his money without receiving any narcotics in return.

In *People v. Ochoa* (2009) 179 Cal.App.4th 650, 662, the defendant did not call out a gang name, display gang signs, wear gang clothing or engage in gang graffiti to take credit for the crimes. There was also no evidence the crimes were committed in gang territory or that of its rival. (*Ibid.*) Nor was there any evidence that the defendant committed the crimes with a gang member. (*Ibid.*) Unlike in *Ochoa*, here there was evidence that defendant committed the crime with a Norteno gang member and his gang associates. There was also evidence that the car driven by defendant during the crimes had the number 114 on it, which Agent Marquez testified was a Norteno gang symbol. Defendant himself had a star tattoo on his neck, a symbol often associated with the Norteno street gang. And, Bergara had the Huelga bird tattoo, an earned Norteno gang tattoo on his arm.

## III

### *Gang Expert Testimony*

Defendant finally contends Agent Marquez impermissibly testified that defendant specifically shot at an occupied vehicle in order to promote or further the Norteno street gang. The People concede that certain questions posed to Agent Marquez improperly asked him to opine on defendant specifically, rather than on a hypothetical actor, but allege the error is harmless because had the questions been properly phrased in the form

26

of a hypothetical question, the same information would have been elicited from Agent Marquez. While we agree an error occurred and find it harmless on this record, we do so for a different reason than the one posited by the People.

California law permits a person with "special knowledge, skill, experience, training, or education" in a particular field to qualify as an expert witness (Evid. Code, § 720), and to give testimony in the form of an opinion. (Evid. Code, § 801.) A trial court generally has "broad discretion in deciding whether to admit or exclude expert testimony [citation], and its decision as to whether expert testimony meets the standard for admissibility is subject to review for abuse of discretion." (*People v. McDowell* (2012) 54 Cal.4th 395, 426.)

Under Evidence Code section 801, expert opinion testimony is admissible only if the subject matter of that testimony is "sufficiently beyond common experience that the opinion of an expert would assist the trier of fact." (Evid. Code, § 801, subd. (a).) "The subject matter of the culture and habits of criminal street gangs . . . meets this criterion." (*People v. Gardeley* (1996) 14 Cal.4th 605, 617.)

" 'Generally, an expert may render opinion testimony on the basis of facts given "in a hypothetical question that asks the expert to assume their truth." [Citation.]' " (*People v. Vang* (2011) 52 Cal.4th 1038, 1045 (*Vang*).) " 'Such a hypothetical question must be rooted in facts shown by the evidence . . . .' " (*Ibid.*)

There is a difference, however, "between testifying about specific persons and about hypothetical persons." (*Vang, supra,* 52 Cal.4th at p. 1047.) An expert may not testify whether a specific defendant committed an offense for gang purposes. (*Id.* at p. 1048.) An expert may only express an opinion, based on hypothetical questions that track the evidence, on whether an offense, if the jury found it in fact occurred, would have been for a gang purpose. (*Ibid.*)

In this case, Agent Marquez was asked whether defendant committed the crimes with which he was charged for the benefit of, at the direction of, or in association with

the Norteno street gang. Over defense counsel's objection, Agent Marquez responded that, in his opinion, defendant aided and abetted in committing the alleged crimes, which he believed were gang related.

As the People concede and we agree, asking Agent Marquez whether defendant specifically committed the alleged crimes for the benefit of the gang was improper. (*Vang, supra,* 52 Cal.4th at p. 1048.) This does not end our inquiry, however.

Defendant's claim is, substantively, one of erroneous admission of evidence, subject to the standard of review for claims of state law error. (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 76 (*Coffman*) [claim that witness "gave inadmissible opinion testimony on the central question of [a defendant's] guilt" "is, in substance, one of erroneous admission of evidence, subject to the standard of review for claims of state law error"].) On this record we cannot say that it is reasonably probable the jury would have found the gang enhancement not true had the error not occurred. We would reach the same conclusion even if we applied the heightened harmless beyond a reasonable doubt standard that defendant argues governs our review.

In our view, the error is harmless not because the prosecutor *could* have asked the question in a hypothetical as the People argue, but because the prosecutor actually *did* ask Agent Marquez a hypothetical that essentially elicited the same opinion. Thus, even assuming the error had not occurred, the jury would still have heard Agent Marquez's opinion that hypothetical crimes, matching those alleged in this case, were gang related.

Before asking Agent Marquez the improper question, the prosecutor first posed a lengthy hypothetical tracking the evidence presented during trial and asked Agent Marquez whether, in his opinion, the hypothetical crimes were committed in association with or for the benefit of the Norteno street gang. Agent Marquez opined that the hypothetical crimes were gang related and that the hypothetical person knowingly associated with a Norteno gang member in carrying out the crimes. Agent Marquez then explained his reasoning for his opinion.

This proper opinion testimony, coupled with the rest of the evidence discussed above, amply supported finding that the shooting offense with which defendant was charged was gang related.

We also disagree with defendant's contention that the error shifted the responsibility for deciding whether the crimes were gang related from the jury to the witnesses. The jury was instructed that it was not bound by the expert's opinion, and that it could disregard that opinion if it found it unbelievable, unreasonable, or unsupported by the evidence. Jurors are presumed to understand and follow the trial court's instructions. (*Coffman, supra,* 34 Cal.4th at p. 83.)

DISPOSITION

The judgment is affirmed.

      HULL      , Acting P. J.

We concur:

    DUARTE    , J.

    HOCH    , J.