Filed 7/25/23  P. v. Johnson CA4/1
# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D080683 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD288890) |
| RYAN JAIRE JOHNSON, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, David M. Gill, Judge.  Affirmed as modified.

Christine M. Aros, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, A. Natasha Cortina and Stephanie A. Mitchell, Deputy Attorneys General, for Plaintiff and Respondent.

MEMORANDUM OPINION[1]

A jury convicted Ryan Jaire Johnson of pandering by procuring Jane Doe for prostitution (Pen. Code,[2] § 266i, subd. (a)(1); count 1); pimping Jane Doe for prostitution (§ 266h, subd. (a); count 2); and pandering by encouraging an undercover officer to become a prostitute (§ 266i, subd. (a)(2); count 3). The trial court sentenced Johnson to the middle term of four years in prison on each of the three counts, and ordered the sentences on counts 2 and 3 to run concurrent to the sentence on count 1.[3] On appeal, Johnson contends substantial evidence does not support his convictions on counts 1 and 2, and his sentence on those counts violated section 654's proscription against multiple punishments. We reject his substantial evidence challenge but conclude the trial court erred in imposing separate and unstayed terms for both pimping and pandering Jane Doe. Because the sentencing triad for counts 1 and 2 are the same, we will modify the judgment by staying the sentence for count 1 and affirm the judgment as modified.

---

[1] Because this appeal raises no substantial issues of law and the factual issues presented are determined by the substantial evidence rule, we resolve this case by memorandum opinion pursuant to California Standards of Judicial Administration, section 8.1.

[2] All further undesignated statutory references are to the Penal Code.

[3] Johnson was also charged with carrying a concealed firearm in a vehicle, a misdemeanor (§ 25400, subd. (a)(1)), in count 4. He pled guilty to the misdemeanor count before trial and he was later sentenced to time served on it.

I.

*Substantial Evidence Supports Johnson's Convictions on Counts 1 and 2*

In reviewing Johnson's sufficiency-of-the evidence challenges, we review the entire record in the light most favorable to the jury's verdicts to determine whether it discloses evidence that is reasonable, credible, and of solid value from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*People v. Abilez* (2007) 41 Cal.4th 472, 504.) "We presume in support of the judgment the existence of every fact the jury reasonably could deduce from the evidence." (*People v. Jennings* (2010) 50 Cal.4th 616, 638–639.) We reverse for insufficient evidence only where it clearly appears that upon "no hypothesis" is there sufficient evidence to support a conviction. (*People v. Ewing* (2016) 244 Cal.App.4th 359, 371.) The standard of review is the same whether the People's case relies on direct or circumstantial evidence. (*Abilez*, at p. 504.) Given our limited role on appeal, a defendant bears "an enormous burden" in claiming there is insufficient evidence to sustain his convictions. (*People v. Veale* (2008) 160 Cal.App.4th 40, 46.) Applying these principles, we have no difficulty concluding substantial evidence supports Johnson's convictions on counts 1 and 2.

A.      *Pandering by Procuring (Count 1)*

A person is guilty of pandering if he "[p]rocures another person for the purpose of prostitution." (§ 266i, subd. (a)(1).) "[T]he term 'procure' has been construed to mean 'assisting, inducing, persuading, or encouraging' a person to engage in prostitution." (*People v. Campbell* (2020) 51 Cal.App.5th 463, 485 (*Campbell*).) "Pandering is a specific intent crime. To be guilty of the offense, the defendant must have the specific intent to persuade, encourage or otherwise influence the target" to engage in prostitution. (*Id.* at p. 487; *People v. Zambia* (2011) 51 Cal.4th 965, 977 [holding a defendant can be

3

convicted of pandering even if the target is already a prostitute].) "The crime of pandering requires no monetary gain." (*Campbell*, at p. 487.) Nor does it require that actual acts of prostitution take place. (*People v. Osuna* (1967) 251 Cal.App.2d 528, 531 (*Osuna*).) The trial court correctly instructed the jury on the elements of pandering.[4]

The People's evidence at trial—including the testimony of officers who worked undercover in the human trafficking operation that led to Johnson's arrest, and Johnson's own recorded words—was more than sufficient for a reasonable jury to find the essential elements of pandering (and pimping) beyond a reasonable doubt.[5]

On January 21, 2021, Johnson contacted "Savannah" on a dating website used by human traffickers and sex workers called "Tagged." Savannah was a fictional White, 33-year-old female sex worker created by

---

[4]    CALCRIM No. 1151 provided, in relevant part, that the People must prove (1) Johnson successfully persuaded or procured Jane Doe to become a prostitute and (2) he intended to influence Jane Doe to be a prostitute.

[5]    In his opening brief on appeal, Johnson sets out the corpus delicti rule but does not provide any specific argument regarding its application in this case. To the extent he contends the People failed to establish the corpus of pandering without reliance on his out-of-court statements, we would reject the contention for two reasons. First, the rule does not apply to words that constitute a part of the crime itself (see *People v. Carpenter* (1997) 15 Cal.4th 312, 393–394, overruled on other grounds in *People v. Diaz* (2015) 60 Cal.4th 1176, 1190–1191; *Carpenter* at p. 394 ["the corpus delicti rule is designed to provide independent evidence that the crime occurred, not to help determine whether the statement was made"]), such as words to assist, induce, persuade, or encourage another person to engage in prostitution. Second, even if the rule applied here, the People need only prove the corpus delicti by some slight or prima facie evidence that the charged crime, not some other crime, was committed. (*People v. Alvarez* (2002) 27 Cal.4th 1161, 1171.) On this record, we conclude the People have met that low bar.

4

Christian Franco of the San Diego County Sheriff's Department, Human Trafficking Task Force. During the exchange on Tagged, Johnson recruited Savannah to "join [his] team."[6] The phrase is known to be used by pimps to recruit sex workers to refer to "a stable or a team," and means "multiple women are working under the direction of one trafficker or one pimp." Johnson told Savannah he had another woman named "Kakes," later identified as Jane Doe,[7] working for him and who would be Savannah's "wifey." That term is used by two sex workers "working under the umbrella of a trafficker" to refer to each other.

Posing as Savannah, Franco contacted Kakes at the phone number Johnson provided so Kakes could "vouch" for him. Franco then located a sex advertisement for Kakes on "Mega Personals," a "heavily trafficked" website with the "sole purpose" of facilitating commercial sex.

On January 25, 2021, Franco texted Kakes, this time posing as a sex buyer, to solicit "a sex act." Kakes agreed and provided him with the address of a Motel 6. In Franco's experience, it is "[v]ery common" for sex workers to work out of hotels and for the pimp to pay for the room. Franco cancelled the date with Kakes and later obtained the registry from the motel. It revealed that Johnson and his vehicle were registered at the motel for two days "that fell right on that time period where [Franco] cancelled the date with Kakes."

---

[6]    Johnson does not assert there is insufficient evidence to support his conviction on count 3, pandering by use of promises to encourage an undercover officer to engage in prostitution, in violation of section 266i, subdivision (a)(2).

[7]    We refer to Jane Doe as Kakes when discussing the communications between Johnson and the officers in their undercover roles.

An undercover officer (UC) took over as the "female voice" for Savannah in phone calls and text messages with both Johnson and Kakes. In a recorded phone call,[8] Johnson told Savannah he was driving Kakes and they were "about to go make some money."[9] Savannah asked him, "how does this work?" and Johnson, alluding to Kakes, responded, "How do me and her work or how, would we all work . . . ?" Savannah said she wanted to understand his "expectations" because she had "never really worked with anyone or on a team."

Johnson told Savannah: "I don't fuck with pimps like that, so. I run a different program than the regular n----" and "we all work together." He told Savannah he had rules and she could not do what she wanted. Referring to Kakes, he explained: "[S]he has a little bit of control. It's not like I'm just taking control of her or nothin' like that. . . . when I see shit that I don't like, I'ma speak on it. . . . So it's not like she don't got control." But he made clear he was "the man" and "dominant."

They discussed the compensation structure. Johnson told Savannah, "[A]s far as money goes, I ain't the type to just leave you with no shit." Savannah asked him, "How much would you . . . keep or is it a percentage or like a set fee[?]" He answered: "[I]t's not really no percentage . . . you tell me what you need and I make sure you got it. . . . [¶] if you was like . . . 'I need a

<hr>

8      The jury heard the audio recording of this phone conversation.

9      During his testimony, Johnson admitted he was driving Kakes to a "date" or "her escorting duties" at the time of the call. Based on this admission and the full context of the conversation, including that the UC eventually spoke with Kakes on the call before it concluded, a jury could reasonably infer the female companion Johnson spoke of throughout the recorded call was Kakes.

6

couple hundred dollars to go do this' or whatever, . . . You got that. . . . [¶] Or if you like, . . . 'I just want money in my pocket just to feel like y'all got money in my pocket', you got that too. . . . I'm always gonna try to make sure you feel happy."

Savannah asked Johnson, "where do you guys work typically in San Diego?," and he told her: "[W]here you would work at would be . . . a little bit different on where [Kakes] would go because you're not black. . . . [¶] Most of the places, y'all could go together because she's not a dark-skinned black girl. But some places she can't fuck with because she's not white." When Savannah said she was "not down to walk the streets," Johnson told her they would not work "the track"[10] but "if it comes to [that] point . . . then at least [she]'ll have somebody to go with."

Johnson told Savannah if she did not know how to advertise for herself, he would create her posting so she "could start making some real money." When Savannah asked, "Who sets prices and stuff like that?," Johnson said: "I do." He told Savannah her price "depends on what you look like, who you are, how you get down." They discussed what sex acts Savannah would or would not have to perform. And before Johnson ended the call, Kakes got on the phone to say hello to Savannah.

Johnson also exchanged the following text messages with Savannah.[11] On January 24, 2021, Johnson told Savannah she should charge "80 for a quick visit, $150 a half hour and $220 an hour." He told her his plans for the

---

10    The UC explained that "track" is the term used to describe "the area where [prostitutes] would walk to solicit prostitution."

11    The jury received evidence of all the text messages between the UC and Johnson.

7

night was "[j]ust make money" and that he was "about to get Kakes in a sec." On January 25, Johnson told Savannah he had "[j]ust dropped [K]akes off bout to go back to the hotel" and that they made money "[e]very time." Later, Johnson said he was "on a call with Kakes getting some money" and was "waiting for her to come out." As the UC explained, this meant Kakes "was on a date and he was waiting for her to come out of the room to pick her up or to transport her." On January 26, Savannah told Johnson, " 'Hey, I spoke to Kakes and I feel really good about this. She said that *you keep the money* but you are really good about providing for her and always making sure she has what she needs.' " (Italics added.) Johnson replied, " 'Always, I'm not here to play around, we trying to get back to live good and have fun and shit to show for.' "

On January 27, 2021, Franco contacted Kakes as a different sex buyer and negotiated "full service" (i.e., "full intercourse") for a price of $180. Franco gave Kakes the location of a Ramada Inn Hotel with a room number. Franco and his team then set up surveillance at the hotel. After Johnson dropped off Kakes at the hotel, she went to the room and met a male undercover officer posing as the sex buyer. Kakes told the undercover officer to "start off with a donation," meaning "the actual exchange of money." The officer placed $200 on the TV console. Kakes took the money and confirmed "it was an hour of sexual intercourse for $180" and that she wanted to keep the hotel room. Once Kakes and the officer agreed to take off their clothes, officers entered the room and detained Kakes. Other officers found Johnson waiting in his parked vehicle near the hotel. When he got out of his vehicle, he dropped a box of open condoms. Officers found cash and two cell phones inside his vehicle, and cash and a wallet containing his California Driver

License and a Wisconsin Identification Card for Jane Doe were found on his person.

Although Johnson concedes the evidence is sufficient for the jury to conclude Jane Doe advertised herself as a prostitute and solicited business on the internet; that he gave Jane Doe's phone number to Franco; that he obtained a room at the Motel 6 for Jane Doe; and that he dropped Jane Doe off at the Ramada Inn Hotel, he argues there was "no evidence" he persuaded or procured Jane Doe to become a prostitute, intended to influence her to be a prostitute, or knew she was a prostitute. The record does not support these contentions. To the contrary, there is overwhelming evidence from which a reasonable jury could find that Johnson was in the business of recruiting prostitutes, finding a place of business for them (hotels), and advertising to solicit customers for them. And specifically that he assisted Jane Doe in prostitution work with the specific intent of encouraging her to engage in prostitution. (*Campbell*, *supra*, 51 Cal.App.5th at p. 484; *ibid.* ["Pandering is 'the business of recruiting a prostitute, finding a place of business for a prostitute, or soliciting customers for a prostitute.' "].)

B.    *Pimping (Count 2)*

Relevant here, any person "who, knowing another person is a prostitute, lives or derives support or maintenance in whole or in part from the earnings or proceeds of the person's prostitution" is guilty of pimping. (§ 266h, subd. (a).) Pimping is a general intent crime. (*People v. McNulty* (1988) 202 Cal.App.3d 624, 631.) Although the crime of pandering requires no monetary gain, "pimping involves the deriving of support from another

9

person's prostitution." (*Campbell*, *supra*, 51 Cal.App.5th at p. 487.) The trial court also correctly instructed the jury on the elements of pimping.[12]

Johnson asserts his conviction for pimping cannot stand because there was "absolutely no evidence" Jane Doe completed any sexual transaction, obtained money or anything of value as a result of her prostitution, or that she ever provided any of her earnings to him. We reject these contentions too.

The element of prostitution in both the pimping and pandering statutes does not require evidence of a completed sexual act. (*Osuna*, *supra*, 251 Cal.App.2d at p. 531; *People v. Dell* (1991) 232 Cal.App.3d 248, 264 (*Dell*).) Here, the evidence supported the reasonable inferences that Jane Doe worked as a prostitute on Johnson's "team" on an ongoing basis and, during the recorded phone call and text messages with the UC, Johnson stated he was driving, dropping off, or waiting for Jane Doe at places such as "the hotel" to make money. Moreover, in recruiting Savannah to join his team, Johnson said he was in control of the earnings—including setting the prices his prostitutes charged, determining how much of the earnings he gave the prostitutes, as well as where they worked and how they advertised. Further still, Johnson did not deny that Kakes told Savannah that he kept the money and provided for Kakes's needs. Instead, he affirmed it, stating, " 'I'm not here to play around, we trying to get back to live good and have fun and shit to show for.' " Viewing the evidence in the light most favorable to the jury's verdict, there was sufficient evidence to support the jury's finding that Johnson derived financial support from Jane Doe's earnings as a prostitute.

---

12    CALCRIM No. 1150 provided, in relevant part, that the People must prove (1) Johnson knew Jane Doe was a prostitute and (2) the money/proceeds that Jane Doe earned as a prostitute supported Johnson.

(See *People v. Bean* (1988) 46 Cal.3d 919, 933 [" 'Circumstantial evidence may be sufficient to connect a defendant with the crime and to prove his guilt beyond a reasonable doubt.' "].)

## II.

### *Section 654 Prohibits Multiple Punishment on Counts 1 and 2*

Section 654, section (a), provides: "An act or omission that is punishable in different ways by different provisions of law may be punished under either of such provisions, but in no case shall the act or omission be punished under more than one provision." Here, "an 'act or omission' may include not only a discrete physical act but also a course of conduct encompassing several acts pursued with a single objective." (*People v. Corpening* (2016) 2 Cal.5th 307, 311.) " 'If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one.' " (*People v. Correa* (2012) 54 Cal.4th 331, 336.) But if the defendant harbored " 'multiple criminal objectives,' which were independent of and not merely incidental to each other, he may be punished for each statutory violation committed in pursuit of each objective, 'even though the violations shared common acts or were parts of an otherwise indivisible course of conduct.' " (*People v. Harrison* (1989) 48 Cal.3d 321, 335.)

As we have discussed, pandering consists of " 'assisting, inducing, persuading or encouraging' a person to engage in prostitution." (*Campbell, supra,* 51 Cal.App.5th at p. 485; § 266i, subd. (a)(1).) Pimping, as relevant here, consists of knowingly "liv[ing] or deriv[ing] support or maintenance . . . from the earnings or proceeds of [another] person's prostitution." (§ 266h, subds. (a), (b).) Johnson argues he procured Jane Doe for prostitution with the intent of receiving her earnings, the same intent with which he pimped

11

her.  Thus he argues the offenses in counts 1 and 2 were incident to one objective and he may not be punished for more than one.  The Attorney General argues section 654 does not apply because Johnson had separate objectives—i.e. (1) to persuade Jane Doe to join his team and engage in prostitution and (2) to receive her earnings by renting her motel rooms and transporting her to work—that were divisible in time, as the acts of pandering and pimping occurred over four months.

We conclude Johnson has the better argument.  Pandering "is a one-act offense" that is "completed by a defendant's *act of procuring*" (*People v. White* (1979) 89 Cal.App.3d 143, 151), while pimping "is an ongoing continuing offense that occurs over a period of time" (*People v. Lewis* (1978) 77 Cal.App.3d 455, 462; *White*, at p. 151 [pimping "is one ongoing offense—a defendant deriving support or maintenance from the earnings of a prostitute"]).  Thus, a single act of pimping goes on as long as the pimp and the prostitute are in an uninterrupted financial relationship.  (*Lewis,* at p. 462.)  Throughout that time, the panderer/pimp has a single intent and objective of making money.  We thus conclude the trial court should have stayed the sentence on one of the two offenses involving Jane Doe.  However, because the sentencing triad for counts 1 and 2 are the same (three-four-six years), we shall modify the judgment by staying the sentence for pandering as charged in count 1.

## DISPOSITION

Johnson's sentence on count 1 (pandering by procuring Jane Doe) is stayed.  The judgment as modified is affirmed.  The superior court clerk is directed to prepare an amended sentencing minute order and an amended abstract of judgment and to forward a certified copy of the amended abstract

12

of judgment to the Department of Corrections and Rehabilitation.  (§§ 1213, 1216.)

DO, J.

WE CONCUR:

O'ROURKE, Acting P. J.

DATO, J.