Filed 2/17/21  P. v. Patino CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

|  |  |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>ERIK CORY PATINO,<br><br>    Defendant and Appellant. | F077433<br><br>(Super. Ct. No. 17CMS0161)<br><br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Kings County.  Thomas DeSantos, Judge.

Jennifer A. Mannix, under appointment by the Court of Appeal, Defendant and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Eric L. Christoffersen and Darren K. Indermill, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Defendant Erik Cory Patino was convicted by jury trial of murder and possession of a firearm by a felon. On appeal, he contends (1) the trial court erred in permitting the prosecutor's gang expert to directly opine that Patino acted for the benefit of a criminal street gang and did not act in self-defense; (2) the court erred in failing to instruct the jury that the reasonable person standard for self-defense and heat of passion includes consideration of a defendant's age, intelligence, and experience; (3) the court erred in failing to instruct the jury on general and specific intent; and (4) these errors cumulatively violated Patino's right to due process. We affirm.

## PROCEDURAL SUMMARY

On September 11, 2017,[1] the Kings County District Attorney charged Patino with murder (Pen. Code,[2] § 187, subd. (a); count 1) and possession of a firearm by a felon (§ 29800, subd. (a)(1); count 2). As to count 1, the information alleged Patino was an active member of a criminal street gang and committed the offense for the benefit of a criminal street gang (§§ 186.22, subd. (b)(1)(C) & (b)(5), 190.2, subd. (a)(22)), and personally used and intentionally discharged a firearm causing death (§§ 12022.5, subd. (a), 12022.53, subds. (b)-(d)).

On March 23, 2018, the jury found Patino not guilty of first degree murder but guilty of second degree murder on count 1 and guilty as charged on count 2. The jury found true the gang and firearm allegations.

On April 24, 2018, the trial court sentenced Patino to 40 years to life in prison as follows: on count 1, 15 years to life, plus an additional term of 25 years to life for intentionally discharging a firearm causing death. The trial court also imposed and then stayed a 10-year gang enhancement, a 10-year personal use of a firearm enhancement, a

---

[1]     All further dates refer to the year 2017 unless otherwise stated.

[2]     All further statutory references are to the Penal Code unless otherwise stated.

2.

20-year intentional discharge of a firearm enhancement, and a four-year personal use of a firearm enhancement on count 1, and a two-year term on count 2.

On the same day, Patino filed a notice of appeal.

## FACTUAL SUMMARY

### Prosecution's Case

Patino was a Sureño gang member. On January 28, he shot and killed the victim, Jonathan Rivas, who was a Norteño gang member.

#### Confrontation and Shooting

##### G.K.

On January 28, at roughly 10:00 a.m., G.K. was driving west on Orange Avenue toward Letts Avenue in Corcoran. When he was about 1,000 feet from the intersection, he saw Patino and Rivas. Patino stood on the north side of the street and Rivas stood on the south side. G.K. saw one of the men advance and the other retreat. Then the retreating man advanced and the other man retreated. G.K. testified that this "back and forth [continued] until [he] got closer." G.K. testified that Patino and Rivas were no closer to each other than 30 yards at any point in the conflict that he observed. Neither man appeared to be holding anything, but G.K. noticed that Patino was wearing a grey and white flannel overcoat that appeared not to hang normally because of an item concealed underneath.

G.K. "sped up … to get out of the area." He looked back after passing Patino and Rivas and saw Patino in the "middle of the westbound lane" where he "raise[d] his arm" parallel to the ground in the direction of Rivas. At that point, Rivas appeared to be retreating. G.K. did not see Patino or Rivas holding a weapon and did not hear a gunshot.

Approximately 10 or 15 minutes later, G.K. drove through the same intersection. He saw police taping off the area and surrounding Rivas's body.

*C.C.*

C.C. also witnessed the interaction between Patino and Rivas on January 28. She saw Patino and Rivas on the south side of Orange Avenue at Letts Avenue. Rivas walked toward Patino and the men began arguing with, and gesturing at, each other. Both men bent their arms at the elbows and put their hands in the air. At that point, the men were between 12 and 15 yards apart.

The two men began to walk toward each other "like they were about to fistfight" but did not reach each other. Patino then crossed Orange Avenue to the north side of the street, away from Rivas. Rivas ran after Patino but did not move into the street to cross to the north side of the street. C.C. testified "it looked like [Rivas] was going in for a fistfight." She could not tell if Rivas was holding anything because he had his back to her and was running. Patino then revealed what C.C. believed to be a rifle. Patino held the rifle with two hands, kneeled on one knee, and pointed the rifle at Rivas. At that point, Rivas did not appear to be moving toward Patino or trying to hit him.

When C.C. saw the gun, she moved away from the men because she had her child with her. She then heard (but did not see) two gunshots in quick succession. After the gunshots, she heard what sounded like "somebody yell[ing] in pain." "[A] while after [she] heard the shots," C.C. came out from where she was hiding. She saw Rivas on the ground but did not see Patino.

*B.D.*

B.D. lived in the area of the altercation. He saw Patino and Rivas on opposite sides of Orange Avenue at Letts Avenue. They were about 50 feet apart and never got closer to each other than that. B.D. heard the two men arguing and then heard three gunshots. The shots sounded like they came from a small-caliber weapon. After the first gunshot the men continued to argue. Patino then fired a second shot and Rivas began to run south and east, away from Patino. Patino then fired a third shot. Rivas fell as he continued to try to run away.

4.

B.D. and his friend, R.R., went to Rivas and tried to help him. B.D. saw that Patino was Hispanic but did not notice where he went, what he looked like, or what he was wearing.

### R.R.

R.R. lived near the altercation and knew Patino from the neighborhood. R.R. was with B.D. when he heard Patino and Rivas arguing. Patino walked backward, away from Rivas, crossing Orange Avenue to the north where the street intersected with Letts Avenue. Patino and Rivas then stood on either side of Orange Avenue, "arguing [with] each other [and] cussing at each other[;] F this, and F that." "[T]hey were saying f[***] you puto, Sureño, south side. All this gang stuff. You know, Norteño this, and Sureño this, and south side, puto this." Patino "was saying something about south side[; Rivas] was saying Norteño this, Norteño that."

R.R.'s view of Patino was obstructed by a wooden fence, but he heard a small-caliber gunshot from where he believed Patino to be standing—at the telephone pole on the north side of Orange Avenue at Letts Avenue. After the first shot, Rivas began backing away from Patino and said, "You missed puto, try again." Rivas then began to run, and Patino fired two more shots. Rivas fell near a drainage hole southeast of the intersection of Orange and Letts Avenues. After the shooting, R.R. called 911, confirmed that Patino was gone, and ran to Rivas to try to help.

R.R. never saw Rivas holding a screwdriver or any kind of weapon.

### Law Enforcement Response

After the shooting, Corcoran Police Sergeant Alex Chavarria found Rivas's body about 100 yards southeast of the intersection of Orange Avenue and Letts Avenue. Rivas was not breathing and appeared to have a wound on his right arm. A pack of cigarettes, a lighter, a book of matches, and a screwdriver were found in his front pocket.

Corcoran Police Property and Evidence Clerk Jimmy Roarke found a .22-caliber bullet casing in a cement gutter near the roadway at the intersection of Letts Avenue and Orange Avenue.

The same day, Kings County Sheriff's Deputy Oscar Torres spoke to Patino's grandmother and father. Patino's grandmother, L.P., told Torres that Patino came from out of town and wanted to "play badass." He bought the rifle a few months before the shooting and sawed off the barrel. When he returned to her house after shooting Rivas "told [her] what he did." She told Torres that Patino "shot that other person" and "took [his] life." After the shooting, Patino asked L.P. to take the rifle, but she refused. She told Torres that the rifle was hidden in the recessed light housing of the china cabinet in her house.

Patino's father, M.P., told Torres that Patino had a sawed-off .22-caliber rifle that he got from a friend. Patino carried the rifle in his pants for protection from the Norteños. On the day of the shooting, M.P. saw Patino wearing a black and white Pendleton jacket and a Cowboys hat. Patino told M.P. about the shooting. Patino did not appear to be scared; "he was laughing about [the shooting]."

That day, Roarke and other officers arrested Patino and searched his grandmother's house. Roarke recovered a loaded .22-caliber semi-automatic tube-fed rifle wrapped in a black T-shirt from a recessed lighting area above a china cabinet. The rifle was sawed off at the barrel, magazine tube, and stock. Roarke also recovered .22-caliber ammunition on the driveway and in the dining room. Finally, Roarke found a "[P]endleton sweater or jacket … [that] matched the description of the sweater or jacket worn by the subject."

After Patino was arrested, Roarke swabbed Patino's hands for gunshot residue. California Department of Justice Senior Criminalist Megan Gallagher tested those samples and confirmed that they contained gunshot residue. The gunshot residue found

6.

on Patino's hands was of a concentration not commonly found unless a person has handled a firearm or has been around a shooting.

California Department of Justice Senior Criminalist Jessica Winn testified that she examined the rifle recovered from the grandmother's house, the bullet recovered from Rivas's body, and a cartridge case recovered from the scene. The rifle, bullet, and cartridge case were all .22-caliber. The bullet had characteristics that suggested it may have been fired from the rifle. However, Winn determined the cartridge case was not fired from the rifle.

### Autopsy

Dr. Gary Walter performed the autopsy on Rivas. Rivas suffered a single gunshot wound to the right shoulder area. The bullet passed through the right lung, lacerated the aorta, passed through the left lung, and came to a rest near the skin on the left side of Rivas's chest. The gunshot caused "rapid hemorrhag[ing] into the right and left chest cavities," and caused Rivas's death.

### Gang Evidence

#### Corcoran Gang Culture

Deputy Torres, who was working with the gang taskforce, explained that the Norteño and Sureño gangs are both "territorial and turf[-]oriented," predominantly Hispanic rival gangs. Gangs bring in "profit by stealing cars, or doing burglaries, or selling … narcotics." Territorial gangs "claim territory so that they can conduct their illegal activities more freely." They use graffiti to show each other which territories they claim and to tell rival gang members to stay away. They challenge each other for territory by covering each other's graffiti or through open acts of violence. When a gang controls a territory and makes it well known that the gang is violent and protective of its territory, "other gangs are not going to want to go there[] because it is already taken." Similarly, gang members and community members are less likely to report criminal activity by a violent gang and are often reluctant to provide information to law

7.

enforcement about a violent gang because they fear being labeled a "snitch" and being violently retaliated against by the gang.

Gang members put great weight on respect and want others to fear them. For instance, a Sureño will call a rival Norteño the derogatory terms "buster," "chapeta," "chapete, or chap" as a sign of disrespect. Similarly, Norteños often call a Sureño a "scrap" as a sign of disrespect. When a gang member is disrespected by a rival gang member in public, he must respond "with a violent act, or a disrespectful remark," or "he will be seen as a coward." To that end, gang members often carry weapons, ranging from knives and guns to makeshift weapons like screwdrivers. Generally, a gang member elevates his status and reputation in a gang by committing crimes. A gang member who kills a rival gang member increases his own status in the gang and the status of the gang as a whole. When Norteño and Sureño gang members commit acts of violence against each other, it is common for them to yell out their gang name or specific subset affiliation. Declaring an affiliation serves several functions: it intimidates and sends a message to rival gang members, it motivates fellow gang members, and it informs the public that a violent gang was responsible and no one should cooperate with police.

Gang members use clothing, tattoos, and hand signs to identify themselves with a specific gang. Sureños claim the color blue and the number 13. They display the number 13 to show allegiance to the "Mexican Mafia," because "M" is the 13th letter of the alphabet. It is common for Sureños to have tattoos of some combination of the number 13, the roman numeral XIII, the Mayan numeral for 13, the word "Sureño," and three dots. Those tattoos can signify that a member is loyal to the gang, that a member has joined or been "jumped in" to a gang, or that a member has earned the tattoo by "putting in work" for the gang through the commission of crimes. Sureños dress more traditionally than Norteños. They often have shaved heads and wear checkered shirts and creased Dickies brand pants.

8.

Sureños have a specific set of "unwritten rules" or "guidelines" that are supposed to govern their interactions with fellow gang members, the community, rival gang members, and law enforcement. Sureños are supposed to attack any rival gang member they see and are supposed to cover any rival graffiti in their territory. They are not supposed to talk to or cooperate with police or speak ill of fellow gang members. However, Sureños "break th[o]se guidelines all the time."

Norteños dress more modernly than Sureños, often wearing "Guc[c]i" attire and "snap back hats." Norteños identify themselves with the color red, the number 14, and the "Nuelga bird"[3] or "Farmero bird" associated with the United Farmworkers Union. The number 14 is significant to Norteños because "N" is the 14th letter of the alphabet, which they associate both with the Spanish word "Norte" and the "Nuestra Familia" gang. Norteños regularly get tattoos displaying the number 14, a single dot on the right hand and four dots on the left hand, the Mayan numeral for the number 14, the word "Norte," and the name of their gang subset.

Norteños also have rules that govern their conduct. When a Norteño gang member sees a Sureño gang member, their rules require that he either attack the Sureño or seek permission from a higher-up Norteño or "squad leader" to attack the Sureño. However, Norteños do not always seek permission before committing an attack against rival Sureños.

In 2017, between 300 and 400 Sureños lived in Kings County. Approximately 70 or 80 of those Sureños belonged to the "Vickie's Town" subset. However, Norteños controlled most of the gang-occupied areas and outnumbered Sureños by three- or four-

---

**3**     The record reflects that Torres used the word "Nuelga." "Nuelga" is probably a phonetic misspelling of the word "Huelga." (See, e.g., *People v. Arce* (2020) 47 Cal.App.5th 700, 708 [the "Huelga bird" is a symbol associated with the Norteños]; *People v. Lopez* (2020) 46 Cal.App.5th 505, 526 [same]; *People v. Pettie* (2017) 16 Cal.App.5th 23, 37 [same].)

to-one.  Two primary Norteño subsets existed in Corcoran:  the "North Side Locos" and the "Vario Perry Heights."  The Norteño subsets all "g[o]t along and … work[ed] together."  Although each claimed specific territories within the city of Corcoran, they all collectively "claim[ed] all of Corcoran as their territory."

### *Patino's Gang-Related Activity*

In 2015, Torres encountered Patino in Corcoran.  Patino told Torres he was from Stanislaus County and was on probation.  Torres suspected that Patino was a Sureño gang member based on his attire and how he carried himself.  During Torres's first encounter with Patino, he had no visible tattoos showing gang affiliation.  When Torres ended the interaction with Patino, he told Patino that he suspected him of being a Sureño, advised him that Corcoran was a "Norteño dominated city," and told him to "lay low" and "stay out of trouble."

Stanislaus County Sheriff's Detective Robert Huffman investigated gang-related crimes in Patterson and had interactions with hundreds of gang members, including the "Garza Park Cholos" Sureño subset gang members who claimed the east side of Patterson.  The Garza Park Cholos routinely committed crimes in Patterson with members of Sureño subsets from elsewhere in California.

In 2016, Stanislaus County Sheriff's Deputy Eric Peterson initiated a traffic stop near Garza Park in Patterson.  Patino opened the rear passenger door of the vehicle and fled with an open container of alcohol.  Other gang members, including one of the founding members of the Garza Park Cholos gang, were in the vehicle.  Huffman explained that Patino ran from the vehicle with the alcohol to try to impress the higher-ranking gang members by diverting attention and criminal liability from them.

In the same year, Stanislaus County Sheriff's Deputy Kyle Briggs encountered Patino at the north steps of Garza Park.  Patino was caught with fresh blue paint on his hands and was near blue gang-related graffiti of Patino's gang moniker, "Demon," as well as "13," "SUR 13," "SUR," and "GCP 209."

10.

Also in 2016, Stanislaus County Sheriff's Deputy Wade Carr found Patino in Garza Park spray painting gang-related graffiti. By spray painting gang graffiti, Patino was claiming the territory for the Garza Park Cholos Sureño gang.

In 2017, Patino approached J.M., a non-gang member who was wearing a red shirt and red and white shoes, at a liquor store. Patino asked J.M. where he was from and if he "banged." J.M. told Patino he was not a gang member. Patino then lifted his shirt and showed J.M. the handle of a knife. Huffman explained that Sureño gang members perceive anyone wearing red around them as a sign of disrespect and a sign that the person may be a rival Norteño gang member. In such situations, Sureño gang members are required by the rules of their gang to intimidate or harm the potential rival gang member. Doing so elevates the Sureño gang member's status within the gang.

In a separate incident, Newman Police Officer Ashley Williams encountered Patino and three other men in Pioneer Park, about 12 miles south of Garza Park. As officers approached, Patino took a knife out of his pants and "put it in the ground." Patino and the three other men were all wearing clothing common to Sureños. One of the other men was a known Sureño gang member.

After Patino was arrested in relation to this case, he asked Torres if he was going to be housed in the jail "with the homies right away." Patino clarified that he was "a southsider" and wanted to be housed with the other southsiders.

While Patino was in custody, and housed in a jail pod with Sureño gang members, he and his cellmate physically assaulted another Sureño gang member housed in their pod. The attack was a "removal"—a punishment by the Mexican Mafia for any number of violations of their rules, signaling that the removed gang member was no longer welcome with the other Sureño gang members.

On the date of trial, Patino had three dots tattooed on his left cheek, one dot tattooed on his right hand and three dots tattooed on his left hand, "E" tattooed on his right hand and "S" tattooed on his left hand, "1" tattooed on his right shin and "3"

11.

tattooed on his left shin, and an apparently incomplete tattoo of "GAR" across his chest. According to Huffman, the "ES" meant "east side" and probably referred to "East Side Paton" Sureños; the dots and the "1" and "3" referred to "13," a number claimed by the Sureños; and the "GAR" probably referred to the Garza Park Cholos. Those tattoos were all associated with the Sureño gang. Patino also admitted he had a gang moniker— "[D]emon."

Based on all of the gang activities, associations, attire, and tattoos, Huffman opined that Patino was an active gang member. Huffman further opined that if Patino killed a rival gang member, it would support Huffman's conclusion that Patino was an active gang member. Huffman and Torres opined that if an individual in Patino's position, with Patino's tattoos, who moved from Stanislaus County to Kings County did kill a rival gang member after yelling "south side," that killing would benefit the Garza Park Cholos Sureño subset, the Vickie's Town Sureño subset, and the Sureños generally.

### Rivas's Gang-Related Activity

Torres interacted with Rivas three or four times before his death. Rivas was a member of the "Varrio Perry Heights" Norteños. His moniker was "Savage." At the time of his death, Rivas had been a Norteño gang member for six or seven years. Torres testified that Rivas may have been a highly enough ranked Norteño gang member that he was not required to seek permission before attacking Patino.

### Defense Case

Patino testified that he was a Sureño gang member. He became a Sureño in Stanislaus County, in the city of Newman, at the age of 17. He joined the Sureño gang for protection because groups of two to four Norteño gang members repeatedly confronted him after school even though he was not gang affiliated. Patino decided to leave Stanislaus County in favor of Corcoran because he was getting into trouble and committing crimes. Patino acknowledged that the prosecutor's evidence regarding his prior offenses was "mainly true."

12.

When Patino arrived in Corcoran, about two-and-a-half months before the shooting, he had no interaction with Sureño gang members and wanted to leave the "gangster life[]style" behind. Although he wanted to make a new start in Corcoran, when he made trips to the store, he was recognized by Norteño gang members who saw his tattoos identifying him as a Sureño gang member. In his first month in Corcoran, he "had some altercations with some Norteños" during which he was threatened. After about a month in Corcoran, he obtained a gun for protection. He then put images of the gun on Facebook to warn others that he "ha[d] a weapon" and to stay away.

On the day of the shooting, Patino encountered Rivas at a liquor store about a quarter of a mile south of the intersection where the shooting took place. As Patino exited the store, Rivas stood in front of the store and "mad dogged" him. Patino described "mad dogging" as a "challenge with your eyes." Patino ignored Rivas and walked across the street to the sidewalk and away from Rivas. As Patino walked away, he noticed that Rivas was following him. When Patino looked at Rivas, Rivas shouted, "What is up[,] scrap[?]" Patino described "Scrap" or "Scrapa" as "a derogatory word Northerners use [to refer to] Sureños." When Rivas called out, he was holding what Patino believed to be an icepick but was actually a modified screwdriver. Patino responded by telling Rivas that he was just going home, asking what he wanted, and pulling back his shirt to show his gun. Rivas put the screwdriver away and Patino believed that the interaction was over.

As Patino walked away from Rivas on Letts Avenue toward Orange Avenue, Rivas called out again and told Patino that they were going to fight. Patino again responded that he did not want to fight, and he just wanted to go home. When Patino told Rivas that he did not want to fight, Rivas "pulled out the screwdriver once more," started calling Patino names, and continued to advance on him. Patino continued walking north and crossed to the north side of Orange Avenue. He stopped at the corner because his grandmother's house was nearby and he did not want Rivas following him home. Patino

13.

told Rivas, "Man, you got to stop following me. I am not going to fight[.] [Y]ou need to leave me alone." Rivas continued to shout at Patino and move toward him. At no point was Patino "representing a hood," "yelling south side," or "calling [Rivas] names."

Rivas began to run toward Patino. When Rivas was less than 20 feet from him, Patino removed his gun from under his shirt, dropped to one knee, pointed the gun at Rivas, and fired three times. Rivas did not stop running toward Patino until after Patino fired all three shots. After Patino fired all three shots, Rivas began to run away, and Patino ran home. Patino never heard Rivas yell, "You missed[,] puto."

Patino "was not trying to kill [Rivas]" when he fired. Patino was "very frightened" and "feared for [his] life." Rivas "seemed determined … to inflict harm on [Patino]" based on "how long he followed [Patino]," his constant yelling at Patino, and the threats he made to Patino. Patino believed Rivas "was going to stab [him and] possibly kill [him]."

When Patino arrived home at his grandmother's house, he hid the gun because he did not want to be caught with it. He then lied to law enforcement when asked about his involvement in the shooting because he did not think law enforcement would believe him if he told the truth.

Patino acknowledged that an active Sureño gang member benefits the Sureño gang by killing a Norteño gang member. He acknowledged that when he shot Rivas, Rivas was not close enough to hurt him and might have been turning to run away.

*Prosecution's Rebuttal*

Torres testified that after hearing Patino's testimony, it remained his opinion that the shooting benefitted the Sureño gang.

## DISCUSSION

## I.     Gang Expert Testimony

Patino contends that the trial court erred when it permitted Deputy Torres to comment on the evidence, and opine that Patino acted to benefit the gang and did not act

14.

to defend himself.  The People respond that Torres did not improperly comment on Patino's "mental state, his specific intent, or the validity of any defense."  Rather, the People argue, he properly assumed that a hypothetical crime was committed and confirmed that Patino's testimony did not change his opinion that "the hypothetical 'subject' [of his expert opinion] was representing his gang and wanted everyone to know that a member of the Sureño gang was committing the crime."  In the alternative, the People contend "any error was harmless because it is not reasonably probable [Patino] would have achieved a more favorable result, had the court excluded the challenged testimony."

We find that the trial court erred in permitting Torres to opine directly on whether Patino committed the offense to benefit a gang, but we conclude that the error was harmless.

## A.     Additional Background

Torres testified repeatedly throughout the prosecutor's case-in-chief on several topics, including Corcoran gang culture, his prior interaction with Patino, his interview of witnesses, Rivas's gang activities, and his own opinion regarding whether the shooting benefitted the Sureño gang and the Vickie's Town subset.  As to whether the shooting benefitted the gang, the prosecutor asked:

> "So I am going to ask you to assume that the facts that we have heard during this trial are true.  Specifically[,] that we heard evidence that two men are observed in the City of Corcoran, which is predominantly a Norteño dominated turf.  That one of the two men has three dots under his eye, G-A-R on his chest.  E-S on his hands.  And that him and another male are arguing.  At some point they are across the street from each other at Orange and Letts Avenue.  The male with those tattoos, the E-S and the G-A-R pulls out a [.]22[-]caliber rifle, fires the rifle once.  The other male who is 50 feet away holding no items, defensive items in his hands says, 'You missed puto, try again mother f[*****].'  Then the Sureño backs up even further, takes a knee, aims the sawed-off rifle, the rifle.  At least one bullet strikes the Norteño as he is running away, goes through his shoulder,

15.

through his lungs, through his heart, and he bleeds to death.  In your opinion would that crime benefit the Vickie's Town Sureños?"

Torres answered, "Yes, it would."

The prosecutor also asked Torres whether the crime would benefit the Garza Park Cholos Sureño subset and the Sureños gang as a whole, and received the same affirmative answer.

After the defense case, which consisted only of Patino's testimony, the prosecutor recalled Torres on rebuttal to ask whether Patino's testimony changed his opinion that the shooting benefitted the gang.  The following is the exchange, in full:

> "[PROSECUTOR]:  Now based on the additional information you just heard from [Patino], has your opinion as to whether this crime benefited the Sureño criminal street gang?

> "[TORRES]:  No.

> "[PROSECUTOR]:  And could you explain?

> "[TORRES]:  Well, he said it himself it benefits the criminal street gang.  Not only that, but obviously they are making the defense that it was self-defense.  Due to the distance, and due to the fact that the subject was yelling out south side, again, he is representing his gang, and he wants everyone to know that it is south side that is doing this.

> "[DEFENSE COUNSEL]:  Your Honor, I am going to object to this opinion.  The officer said due to the distance and so on, they[] are varying.

> "[PROSECUTOR]:  Objection, speaking objection.

> "[DEFENSE COUNSEL]:  I don't think he can make an opinion of that nature.

> "[PROSECUTOR]:  Move to strike his comment.

> "THE COURT:  There is an objection as to opinion testimony.  He is giving an opinion as to whether or not the actions are for the benefit of the gang.  He is not giving an opinion as to what is in the mind of [Patino] at this point in time.  The answer stands.

> "[PROSECUTOR]:  Was your answer completed, or were you still answering?

16.

"[TORRES]: No, it is just him yelling out south side. Again, it is going to—eliminating a rival, it is going to benefit the gang. Now I totally lost my train of thought before all that happened. But, yeah, it doesn't change my opinion.

[PROSECUTOR]: Was anything else that was said by [Patino] significant to you in terms of whether this is for the benefit of the gang?

"[TORRES]: No, it does not change my opinion."

The remainder of Torres's rebuttal testimony was unrelated to Patino's defenses and his opinion that the shooting benefitted the Sureño gang.

## B. Standard of Review

We review the trial court's admission of evidence, including expert testimony, for abuse of discretion. (*People v. Flores* (2020) 9 Cal.5th 371, 397; *People v. Lucas* (2014) 60 Cal.4th 153, 226, disapproved on another ground in *People v. Romero and Self* (2015) 62 Cal.4th 1, 53, fn. 19.) " 'A court abuses its discretion when its ruling "falls outside the bounds of reason." ' " (*People v. Catlin* (2001) 26 Cal.4th 81, 122; accord *People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124.) Abuse of discretion is established by " ' "showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." ' " (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 390.)

## C. Analysis

Patino contends that, in his rebuttal testimony, Torres improperly commented on Patino's intent and his defense. The People respond that Torres "merely explained that, based on the facts presented to him, he believed the hypothetical 'subject' was representing his gang and wanted everyone to know that a member of the Sureño gang was committing the crime."

California law permits a person with "special knowledge, skill, experience, training, or education" in a particular field to qualify as an expert witness. (Evid. Code, § 720.) Qualified experts may offer opinion testimony if the subject matter is

17.

"sufficiently beyond common experience" such that the expert's opinion "would assist the trier of fact." (Evid. Code, § 801, subd. (a).) In general, " '[t]he subject matter of the culture and habits of criminal street gangs … meets this criterion.' " (*People v. Vang* (2011) 52 Cal.4th 1038, 1044 (*Vang*).) Such testimony can include "whether and how a crime was committed to benefit or promote a gang." (*People v. Killebrew* (2002) 103 Cal.App.4th 644, 657 (*Killebrew*), disapproved on other grounds in *Vang*, at pp. 1044-1048.)

However, no witness may " 'express an opinion on a defendant's guilt.' " (*Vang, supra*, 52 Cal.4th at p. 1048.) An expert witness is no exception. Expert witness testimony may "not be admitted at trial … to show a defendant's criminal disposition or bad character as a means of creating an inference the defendant committed the charged offense" (*People v. Sanchez* (1997) 58 Cal.App.4th 1435, 1449) or " 'to prove intent or culpability' " (*People v. Memory* (2010) 182 Cal.App.4th 835, 859). Nor may an expert give an opinion on "whether a witness is telling the truth." (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 82 (*Coffman and Marlow*).)

An expert opinion may, however, be rendered in the form of responses to hypothetical questions that ask the expert to *assume* the truth of certain facts rooted in the evidence. (*People v. Richardson* (2008) 43 Cal.4th 959, 1008; see *Vang, supra*, 52 Cal.4th at p. 1046.)[4] In posing hypothetical questions, a prosecutor is not required to disguise that the question is based on the evidence at bar. (*Vang*, at pp. 1047-1048.) An expert witness's answering a hypothetical question that tracks the evidence "is not tantamount to expressing an opinion as to defendant's guilt." (*People v. Ward* (2005) 36

---

[4] As discussed in more detail below, our Supreme Court in *Vang* did not foreclose the possibility that in some situations a gang expert may testify directly—in other words, not through a hypothetical question—regarding whether the charged crime benefitted a gang. (See *Vang, supra*, 52 Cal.4th at p. 1048, fn. 4.)

Cal.4th 186, 210.)  Indeed, if a hypothetical question posed is not based on the evidence, the answer is of no assistance to the jury.  (*Vang*, at p. 1044.)

In *Killebrew*, *supra*, 103 Cal.App.4th 644, the gang expert testified that each of the specific gang members in a caravan of three cars *knew* there was a gun in two of the cars and jointly possessed the guns for protection.  (*Id.* at p. 658.)  The Court of Appeal held that a gang expert is not permitted to testify to a particular defendant's "subjective *knowledge and intent*" because those "issues [are] properly reserved [for] the trier of fact."  (*Ibid*.)

In *Vang*, the defendant argued that *Killebrew* precluded use of hypothetical questions that too closely resembled the facts of the case at bar regarding whether a crime benefitted a gang because such questions would impermissibly elicit comment on the knowledge or intent of the defendant on trial.  (*Vang*, *supra*, 52 Cal.4th at p. 1044; *Killebrew*, *supra*, 103 Cal.App.4th at p. 658.)  Our Supreme Court rejected that argument.  (*Vang*, at pp. 1046-1047.)  In both *Vang* and *People v. Gonzalez* (2006) 38 Cal.4th 932 (*Gonzalez*), where the prosecutors asked hypothetical questions regarding whether a hypothetical crime was gang related, our Supreme Court read *Killebrew* only for the proposition that a gang expert cannot offer a direct opinion on "the knowledge or intent of a [particular] defendant on trial."  (*Gonzalez*, at p. 946; accord, *Vang*, at pp. 1048-1049.)  In other words, *Gonzalez* and *Vang* concluded that *Killebrew* permitted testimony through *hypothetical* questions about what a *hypothetical subject* may have thought or intended, and foreclosed only *direct* testimony about what a *particular defendant* on trial may have thought or intended.  (*Vang*, at p. 1047 ["It would be incorrect to read *Killebrew* as barring the questioning of expert witnesses through the use of hypothetical questions regarding hypothetical persons.… [U]se of hypothetical questions is proper."  (italics omitted)]; *Gonzalez*, at p. 946, fn. 3; *Killebrew*, at p. 658.)

After explaining that *Killebrew* did not apply to opinion testimony in response to hypothetical questions, *Vang* and *Gonzalez* both left open the question of whether, in

19.

some circumstances, a gang expert is permitted to opine directly regarding a specific defendant and the evidence of the case. (*Vang*, *supra*, 52 Cal.4th at pp. 1048-1049 & 1048, fn. 4; *Gonzalez*, *supra*, 38 Cal.4th at pp. 946-947, fn. 3.) *Vang* explained that, to the extent *Killebrew* was "correct in prohibiting expert testimony regarding whether the *specific* defendants acted for a gang reason," it was because such an opinion would ordinarily be " ' "of no assistance to the trier of fact." ' " (*Vang*, at p. 1048.) *Vang* "assume[d] … the expert could not properly have testified about the defendants themselves," but then cited with approval *People v. Valdez* (1997) 58 Cal.App.4th 494 at page 507 (*Valdez*), for the proposition that, "in some circumstances, expert testimony regarding the specific defendant[] might be proper" because it would be helpful to the trier of fact. (*Vang*, at p. 1048, fn. 4; *but see People v. Ewing* (2016) 244 Cal.App.4th 359, 382 (*Ewing*) ["An expert may not testify whether a specific defendant committed an offense for gang purposes."].)

In *Valdez*, members of different Norteño subsets, who were occasionally rivals, committed a crime together against a Sureño gang member. (*Valdez*, *supra*, 58 Cal.App.4th at pp. 508–509.) The gang expert explained how "such a diverse group … could have been acting for the benefit of a street gang *and whether the participants were doing so*." (*Id.* at pp. 508-509, italics added.) The latter part of the opinion was direct, non-hypothetical testimony regarding the crimes charged against the specific defendants and whether the "participants acted for the benefit of each and every gang represented." (*Id.* at pp. 503-504, 509.) However, *Valdez* never addressed the fact that the questions to the gang expert were not asked in hypothetical form. *Valdez* merely concluded that the *subject matter* of the testimony was proper. (*Id.* at pp. 508-509.) The Court of Appeal explained that the content of those "matters [was] far beyond the common experience of the jury and justified expert testimony." (*Ibid*.) An ordinary juror does not understand gang culture and how benefitting one subset of a gang may also benefit another, so those

topics may be the appropriate subject matter of expert testimony. (See *Vang*, *supra*, 52 Cal.4th at p. 1044; *Valdez*, at pp. 508-509.)

After citing *Valdez* with approval, the *Vang* court explained that the gang expert in the case before it could "not testify directly [regarding] whether [any of the defendants] committed the [charged crime] for gang purposes." (*Vang*, *supra*, 52 Cal.4th at p. 1048.) Our Supreme Court explained that the gang expert was precluded from doing so because he "had no personal knowledge whether any of the defendants assaulted [the victim] and, if so, how or why; he was not at the scene."[5] (*Id.* at p. 1048.) For that reason, "[t]he jury was as competent as the expert to weigh the evidence and determine what the facts were, including whether the defendants committed the assault." (*Ibid.*)

Here, Patino contends that Torres improperly commented on his intent and his defense in rebuttal. The People contend that, in his rebuttal testimony, Torres "merely explained that, based on the facts presented to him, he believed the hypothetical 'subject' was representing his gang and wanted everyone to know that a member of the Sureño gang was committing the crime." We find that Torres's testimony in rebuttal was likely understood by the jury to have been direct, non-hypothetical testimony about *Patino* that commented on the veracity of his testimony.

In his rebuttal case, the prosecutor did not reframe Patino's testimony as hypothetical facts. He asked Torres whether, "based on the additional information … just heard from [Patino]," he had changed his opinion that "this crime benefited the Sureño criminal street gang." The prosecutor's question appears to have called for testimony regarding whether *Patino's* charged crime benefitted the gang. Based on Torres's answer, it appears that his opinion may have been based in part on Patino and in part on a

---

[5]    In contrast, in *Valdez*, the court was presented with defense counsel's objection that the expert had no personal knowledge regarding the offense, but the court found whether the expert had personal knowledge regarding the offense irrelevant to whether he could testify to defendant's intent. (*Valdez*, *supra*, 58 Cal.App.4th at p. 505.)

hypothetical subject in Patino's position. Torres began answering by noting Patino "said it himself[;] [the killing] benefits the criminal street gang. Not only that, but obviously they are making the defense that it was self-defense." It is difficult to read that portion of the response as anything other than a direct comment, based on Patino's testimony, that *Patino's* crime benefitted the gang. However, Torres then immediately changed the topic of his opinion from Patino to "the subject": "Due to the distance, and due to the fact that *the subject* was yelling out south side, again, he is representing his gang, and he wants everyone to know that it is south side that is doing this." (Italics added.) Yet, insofar as Torres intended to respond as though he had been posed a hypothetical question, he seems to have assumed that Patino's testimony was *false*. Despite Patino's testimony that he "*wasn't* representing a hood, [and] *wasn't* yelling south side or nothing like that," Torres assumed the opposite. (Italics added.) Torres's answer suggested that the reason he did not change his opinion that the crime benefitted the gang was that he disbelieved Patino's testimony. This reading is consistent with the prosecutor's follow-up question: whether "anything else that was said by [Patino] [was] significant to [Torres] in terms of whether this is for the benefit of the gang[.]" Torres answered "No, it does not change my opinion." Again, the question was not framed in the hypothetical, and therefore a jury could reasonably have understood Torres's answer to mean he still believed that Patino shot Rivas for the benefit of the gang because he did not believe Patino's testimony that he was not "representing a hood" or "yelling south side."

As noted, to the extent it is ever permissible for a gang expert to directly testify regarding whether a specific defendant gang member committed a crime for the benefit of a gang, such testimony should only be admitted where it may be unclear to the lay person how the crime might benefit a gang. (*Valdez, supra*, 58 Cal.App.4th at pp. 508-509; *Vang, supra*, 52 Cal.4th at p. 1048, fn. 4.) In this case, the prosecutor asked Torres in his case-in-chief to explain how the crime may have benefitted *multiple* gangs—the Garza Park Cholos Sureño subset, the Vickie's Town Sureño subset, and the Sureño gang

generally. At that point, allowing direct testimony on how the crime benefitted each gang may have been consistent with *Valdez*, as endorsed by our Supreme Court in *Vang*. (*Valdez*, at pp. 508-509; *Vang*, *supra*, 54 Cal.4th at p. 1048, fn. 4; accord *People v. Williams* (2009) 170 Cal.App.4th 587, 621.) However, the prosecutor's questions were framed as hypothetical questions and were therefore clearly permitted by *Vang*. (*Vang*, at p. 1047.) In contrast, the questions and answers presented during the People's rebuttal case appear to have been direct, non-hypothetical questions that related to whether Patino's assumed crime benefitted "the gang" (rather than each of the previously identified gangs). The subject matter of the rebuttal testimony was not so removed from the common experience of the jury as to require explanation through direct expert testimony. (See *Valdez*, at pp. 508-509.)

Further, like the gang expert in *Vang*, Torres had no personal knowledge regarding if, how, or why the crime took place because he was not at the scene when it happened. (*Vang*, *supra*, 54 Cal.4th at p. 1048.) Despite Torres's lack of personal knowledge and the prosecutor's asking Torres whether the *defendant's testimony* affected his opinion, Torres offered an opinion that assumed facts directly contrary to Patino's testimony. The jury could reasonably have understood Torres's opinion to mean he did not believe Patino's testimony.

The trial court erred by allowing those questions to be asked and answered, in at least partially direct, non-hypothetical form. (*Vang*, *supra*, 54 Cal.4th at p. 1048; *Ewing*, *supra*, 244 Cal.App.4th at p. 382 ["asking [the prosecution's gang expert] whether defendant specifically committed the alleged crimes for the benefit of the gang was improper"].)

## D. Harmless Error

The People contend that any error was harmless and should be judged under the standard of *People v. Watson* (1956) 46 Cal.2d 818 (*Watson*) because the error involved erroneous admission of evidence related to defendant's guilt. (*Coffman and Marlow*,

*supra*, 34 Cal.4th at p. 76.)  *Watson* asks whether "it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error."  (*Watson*, at p. 836.)  Patino contends that the error was prejudicial and that the harmless beyond a reasonable doubt standard of *Chapman v. California* (1967) 386 U.S. 18 (*Chapman*) applies because the error affected his federal constitutional rights.  *Chapman* asks "whether the guilty verdict actually rendered in this trial was surely unattributable to the error."  (*Sullivan v. Louisiana* (1993) 508 U.S. 275, 279, italics omitted.)  "Thus, to say that [the error] … did not contribute to the verdict is to make a judgment about the significance of the [error] to reasonable jurors, when measured against the other evidence considered by those jurors independently of the [error]."  (*Yates v. Evatt* (1991) 500 U.S. 391, 403-404, overruled on other grounds by *Estelle v. McGuire* (1991) 502 U.S. 62, 72, fn. 4.)  The People are correct both in the standard that applies and in the harmlessness of the error.  (*People v. Prieto* (2003) 30 Cal.4th 226, 247 ["The erroneous admission of expert testimony only warrants reversal if 'it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error.' "]; *Coffman and Marlow*, *supra*, 34 Cal.4th at p. 76 [claim of inadmissible opinion testimony on issue of guilt is "one of erroneous  admission of evidence, subject to the standard of review for claims of state law error"]; *People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1179-1180.)  But, even under the heightened harmless beyond a reasonable doubt standard of *Chapman*, we would conclude the error was harmless because Torres had already offered essentially the same opinion through proper hypothetical questions, and the evidence was overwhelming that Patino acted to benefit the gang and not to defend himself.

First, as noted above, Torres opined during the prosecutor's case-in-chief that a gang member in Patino's position would have benefitted the Vickie's Town Sureño subset, Garza Park Cholos Sureño subset, and the Sureño gang generally by killing a Norteño gang member.  The only new element of Torres's opinion offered in the

prosecutor's rebuttal case was Torres's implied opinion that he did not believe Patino's testimony regarding his claim of self-defense, his not having yelled his gang affiliation at Rivas, and perhaps the distance between Patino and Rivas. Torres's testimony suggesting his opinion that Patino did not act in self-defense was very brief and the prosecutor did not repeat that portion of Torres's testimony to the jury in his closing argument. (See *People v. Flores* (2016) 2 Cal.App.5th 855, 881 [considering whether the prosecutor emphasized an erroneous legal theory in closing argument in determining whether introduction of the theory was harmless error under *Chapman*]; *People v. Leonard* (2014) 228 Cal.App.4th 465, 493 [finding the trial court's admission of an expert's testimony that the defendant was a specific type of pimp was harmless error given the brief testimony and overwhelming evidence against the defendant].)

Next, the evidence that Patino acted to benefit the gang and not to defend himself was overwhelming. One witness, R.R., heard Patino say "something about south side" to Rivas in response to Rivas "saying Norteño this, Norteño that" before Patino fired the weapon. Patino admitted during cross-examination that he was wearing gang colors, that he was an active gang member, and that by killing Rivas he benefitted the Sureño gang. No witness saw Rivas with any kind of weapon in his hand and the screwdriver was found in Rivas's pocket when he was searched by law enforcement. No witness saw Rivas cross the street toward Patino or come closer than about 45 feet from Patino when he was shot. By the time Patino fired the first shot, Rivas was backing away from Patino. Then, by the time Patino fired the second and third shots, Rivas was running away from Patino.

Patino admitted that Rivas was at least 15 feet away from him and that he was not in immediate danger from Rivas when he shot Rivas. This testimony alone was sufficient for the jury to find that Patino did not act in self-defense. (*People v. Humphrey* (1996) 13 Cal.4th 1073, 1082 (*Humphrey*); *People v Saavedra* (2007) 156 Cal.App.4th 561, 568 ["self-defense operates as a defense only when the threat of bodily harm is immediate and

25.

present; fear of harm even in the near future is insufficient"].) Patino further acknowledged that Rivas could not have been running directly at him when he fired the fatal shot based on the trajectory of the bullet, penetrating Rivas's right shoulder and eventually lodging just below the skin on the left side of his chest. Specifically, when asked "why is it that the bullet went through [Rivas's] shoulder if he was coming right at you" Patino answered, "I can only imagine that he turned." This evidence also supported the conclusion that Patino did not act in self-defense.

Moreover, the jury had good reason to find that Patino's testimony was not credible. Patino admitted that he repeatedly lied to law enforcement about being involved in the crime, admitted that he lied on the stand, and admitted that he had suffered prior felony convictions. (*People v. Ayers* (2005) 125 Cal.App.4th 988, 996 [considering the credibility of the defense in determining whether erroneous admission of evidence was harmless error].)

The brief nature of the erroneously admitted opinion, the absence of any argument regarding that opinion in closing argument, the overwhelming evidence that Patino did not act in self-defense from all of the other witnesses, and Patino's lack of credibility, lead us to find beyond a reasonable doubt that the jury would have concluded, even without Torres's rebuttal testimony, that Patino shot Rivas to benefit the gang and not to defend himself.

## II.    Self-Defense and Voluntary Manslaughter Amplifying Instructions

Patino argues that the trial court erred in failing to instruct the jury sua sponte that they were required to consider Patino's age, intelligence, and experience in applying the "reasonable person standard[s]" for self-defense and heat of passion voluntary manslaughter. Specifically, Patino first contends that the jury was required to consider his age, intelligence, and experience in determining whether a reasonable person in his position (1) would have perceived imminent danger and would have reasonably believed deadly force was necessary to defend against the danger, and (2) would have reacted

26.

from passion rather than judgment for purposes of voluntary manslaughter. Alternatively, if the court was not required to give the amplifying instructions sua sponte, Patino argues that his counsel was ineffective in failing to request instruction on those points of law.

The People respond (1) the instructions were correct, and the trial court had no sua sponte duty to amplify those instructions, and (2) Patino forfeited any error by failing to object. Alternatively, the People argue (3) any instructional error was harmless and any deficient performance by defense counsel resulted in no prejudice because Patino's youth "and purported inexperience played no role in the case" and Patino's testimony "lack[ed] credibility."

We agree with the People in all three respects.

## A.    Additional Background

The trial court instructed the jury on self-defense with CALCRIM No. 505, as follows, in relevant part:

"The defendant acted in lawful self-defense if:

"1. The defendant reasonably believed that he was in imminent danger of being killed or suffering great bodily injury;

"2. The defendant reasonably believed that the immediate use of deadly force was necessary to defend against that danger;

"AND

"3. The defendant used no more force than was reasonably necessary to defend against that danger.  [¶]  …  [¶]

"When deciding whether the defendant's beliefs were reasonable, consider all the circumstances as they were known to and appeared to the defendant and consider what a reasonable person in a similar situation with similar knowledge would have believed.  If the defendant's beliefs were reasonable, the danger does not need to have actually existed." (CALCRIM No. 505.)

27.

The trial court also instructed the jury on heat of passion theory of voluntary manslaughter with CALCRIM No. 570, as follows, in relevant part:

"A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed someone because of a sudden quarrel or in the heat of passion.

"The defendant killed someone because of a sudden quarrel or in the heat of passion if:

"1. The defendant was provoked;

"2. As a result of the provocation, the defendant acted rashly and under the influence of intense emotion that obscured his reasoning or judgment;

"AND

"3. The provocation would have caused a person of average disposition to act rashly and without due deliberation, that is, from passion rather than from judgment. [¶] … [¶]

"It is not enough that the defendant simply was provoked. The defendant is not allowed to set up his own standard of conduct. In deciding whether the provocation was sufficient, consider whether a person of average disposition, in the same situation and knowing the same facts, would have reacted from passion rather than from judgment." (CALCRIM No. 570.)

Defense counsel did not request amplification of either of these instructions, object that the instructions were incomplete, or request additional instructions.

## B.    Standard of Review

" ' "It is settled that in criminal cases, even in the absence of a request, the trial court must instruct on the general principles of law relevant to the issues raised by the evidence. [Citations.] The general principles of law governing the case are those principles closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case." ' " (*People v. Breverman* (1998) 19 Cal.4th 142, 154 (*Breverman*).) A trial court has a duty to instruct sua sponte on any

28.

defense "for which the record contains substantial evidence … unless the defense is inconsistent with the defendant's theory of the case." (*People v. Salas* (2006) 37 Cal.4th 967, 982; *see People v. Sedeno* (1974) 10 Cal.3d 703, 716, disapproved on other grounds in *People v. Flannel* (1979) 25 Cal.3d 668, 684-685, fn. 12.)

A trial court's obligation to give general instructions sua sponte does not extend to "pinpoint" instructions or optional paragraphs of instructions. (*People v. Whalen* (2013) 56 Cal.4th 1, 81-82 (*Whalen*), disapproved on other grounds in *People v. Romero and Self*, *supra*, 62 Cal.4th at p. 44, fn. 17; *People v. Lawley* (2002) 27 Cal.4th 102, 160-161.) " ' "[W]hen a defendant presents evidence to attempt to negate or rebut the prosecution's proof of an element of the offense, a defendant is not presenting a special defense invoking *sua sponte* instructional duties. While a court may well have a duty to give a 'pinpoint' instruction relating such evidence to the elements of the offense and to the jury's duty to acquit if the evidence produces a reasonable doubt, such 'pinpoint' instructions … must be given only upon request." ' " (*People v. Anderson* (2011) 51 Cal.4th 989, 996-997.) "A party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language." (*People v. Lang* (1989) 49 Cal.3d 991, 1024 (*Lang*), abrogated on another ground in *People v. Diaz* (2015) 60 Cal.4th 1176, 1190.)

We review claims of instructional error de novo. (*People v. Rivera* (2019) 7 Cal.5th 306, 326 (*Rivera*).) In doing so, we are required to review the evidentiary support for giving an instruction " 'in the light most favorable to the defendant' [citation] and … resolve doubts as to the sufficiency of the evidence to warrant instructions ' "in favor of the accused." ' " (*People v. Wright* (2015) 242 Cal.App.4th 1461, 1483 (*Wright*); see *People v. Enriquez* (1977) 19 Cal.3d 221, 228 (*Enriquez*), overruled on other grounds in *People v. Cromer* (2001) 24 Cal.4th 889, 901, fn. 3.) We consider the failure to give an instruction in the context of the instructions as a whole and the trial

record to determine whether there is a reasonable likelihood the jury applied the instructions given in a manner inconsistent with the law. (See *Rivera*, at p. 326; *People v. Mason* (2013) 218 Cal.App.4th 818, 825 (*Mason*); *People v. Burgener* (1986) 41 Cal.3d 505, 538 [" 'The absence of an essential element in one instruction may be supplied by another or cured in light of the instructions as a whole' "], disapproved on another ground in *People v. Reyes* (1998) 19 Cal.4th 743, 756; *People v. Chavez* (1985) 39 Cal.3d 823, 830 ["we must look to the entire charge, rather than merely one part, to determine whether error occurred"].) In doing so, we assume that " ' "jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given." ' " (*People v. Castaneda* (2011) 51 Cal.4th 1292, 1321.) "Where reasonably possible, we interpret the instructions ' "to support the judgment rather than [to] defeat it." ' " (*Mason*, at p. 825.)

## C.    Forfeiture

As noted, a trial court is only required to instruct sua sponte on general principles of law. (*Breverman*, *supra*, 19 Cal.4th at p. 154.) When a defendant fails to request an amplifying instruction and fails to object to the instructions as given, the issue is forfeited on appeal. (*People v. Virgil* (2011) 51 Cal.4th 1210, 1260 (*Virgil*); *Lang*, *supra*, 49 Cal.3d at p. 1024.) We may nevertheless review a forfeited claim of error if it affected a defendant's substantial rights. (§ 1259; *People v. Delgado* (2017) 2 Cal.5th 544, 572, fn. 15.) A defendant's substantial rights were affected if the error "resulted in a miscarriage of justice, making it reasonably probable the defendant would have obtained a more favorable result in the absence of error." (*People v. Andersen* (1994) 26 Cal.App.4th 1241, 1249 (*Andersen*).) This analysis "necessarily requires an examination of the merits of the claim—at least to the extent of ascertaining whether the asserted error would result in prejudice if error it was." (*Ibid.*)

Here, Patino forfeited his claim on appeal. The trial court correctly instructed on the applicable general principles of law. The self-defense instruction directed the jury to

consider "all the circumstances as they were known to and appeared to the defendant and consider what a reasonable person in a similar situation with similar knowledge would have believed." (CALCRIM No. 505.) The heat of passion voluntary manslaughter instruction similarly directed the jury to "consider whether a person of average disposition, in the same situation and knowing the same facts [as defendant], would have reacted from passion rather than from judgment." (CALCRIM No. 570.) Those instructions accurately and completely stated the governing principles. (*Humphrey*, *supra*, 13 Cal.4th at pp. 1082-1083, 1087; *People v. Jones* (2014) 223 Cal.App.4th 995, 999-1001; *People v. Hernandez* (2010) 183 Cal.App.4th 1327, 1334-1335.) Thus, the court had no sua sponte duty to amplify those instructions with further information not "so closely and openly connected with the facts before the court as to come within the court's sua sponte instructional obligations." (*Coffman and Marlow*, *supra*, 34 Cal.4th at p. 101 [the trial court's failure to inform the jury that it could consider the defendant's battered woman syndrome in assessing whether she reasonably perceived imminent harm from the victim did not fall within the court's sua sponte instruction obligation].) If Patino desired amplification, he was required to request it or object when it was not given. (*Virgil*, *supra*, 51 Cal.4th at p. 1260; *Lang*, *supra*, 49 Cal.3d at p. 1024.) This he did not do.

Nevertheless, because Patino claims his substantial rights were affected by the trial court's failure to instruct with the amplification, we turn now to the merits of his claim. (*Andersen*, *supra*, 26 Cal.App.4th at p. 1249.)

### D.     Sufficiency of the Instructions

Patino contends his substantial rights were affected because the self-defense and heat of passion theory manslaughter instructions were *incomplete* in that they did not include direction for the jury to consider his age, intelligence, and experience. We disagree.

To support his proposition, Patino relies primarily on authority related to punishment of juvenile offenders. (E.g., *Miller v. Alabama* (2012) 567 U.S. 460 (*Miller*); *Graham v. Florida* (2010) 560 U.S. 48 (*Graham*); *Roper v. Simmons* (2005) 543 U.S. 551 (*Roper*).) Patino acknowledges that he was not a juvenile at the time of the offenses—he was 22 years old—but argues that those cases are instructive. Specifically, he asks us to take note that the Supreme Court has commented that, for a variety of reasons, juvenile offenders' youth renders them less culpable than mature adults. (*Miller*, at pp. 476-479 [the Eighth Amendment prohibits mandatory life without possibility of parole sentences on juveniles convicted of homicide offenses]; *Graham,* at pp. 69-82 [the Eighth Amendment categorically prohibits imposition of life without possibility of parole sentences on juveniles convicted of non-homicide offenses]; *Roper*, at pp. 568-569 [the Eighth Amendment prohibits imposition of the death penalty on juvenile offenders because of their lack of maturity, susceptibility to negative influence, and underdeveloped character].) Patino also directs us to section 3051, which makes youth offender parole hearings available to "any prisoner who was 25 years of age or younger … at the time of the controlling offense." (§ 3051, subd. (a)(1).) As Patino points out, the youth offender parole framework is premised upon the Legislature's recognition of the "diminished culpability of juveniles as compared to adults." (§ 4801, subd. (c).)

Patino argues that, considering the judicial and legislative recognition that young adults are less culpable for their actions than mature adults, "a young adult with [a] developing brain should not be held to the same reasonable person standard as that of a mature adult." Patino is mistaken. As noted, *Miller*, *Graham*, and *Roper*, as well as section 3051, all deal with *punishment* for juvenile offenders. They do not purport to apply to the *elements* of an offense and we have found no case that extends them for such a purpose.

Next, Patino notes that evidence of a defendant's life experiences can be relevant to show that a reasonable person in Patino's position "would believe in the need to kill to

32.

prevent imminent harm." (*Humphrey*, *supra*, 13 Cal.4th at p. 1087; accord *People v. Minifie* (1996) 13 Cal.4th 1055, 1065 [" 'A person claiming self-defense is required to "prove his own frame of mind," and in so doing is "entitled to corroborate his testimony that he was in fear for his life by proving the reasonableness of such fear." ' "]) However, our Supreme Court has made clear that even when such evidence is admitted, a court does not "replac[e] the reasonable 'person' standard" with, for instance, a reasonable " 'battered woman' " standard" or " ' "reasonable gang member" standard.' " (*Humphrey*, at p. 1087.; accord *People v. Sotelo-Urena* (2016) 4 Cal.App.5th 732, 751-752 (*Sotelo-Urena*) [admitting expert testimony regarding dangers associated with chronic homelessness does not create a "reasonable homeless person" standard]; *see People v. Jefferson* (2004) 119 Cal.App.4th 508, 519 ["a reasonable person is not one who hears voices due to severe mental illness" but a " 'normal person' "].) "The jury must consider defendant's situation and knowledge, which makes the evidence relevant, but the ultimate question is whether a reasonable person … would believe in the need to kill to prevent imminent harm." (*Humphrey*, at p. 1087, italics omitted; *see People v. Jefferson,* at p. 519.) A defendant's age, intelligence, and experience do not change the applicable reasonable person standard.

Patino relies on *People v. Mathews* (1994) 25 Cal.App.4th 89 (*Mathews*), for the proposition that a jury must be instructed to consider the defendant's limitations in deciding whether a reasonable person in the defendant's position would have believed in the need to use deadly force. In *Mathews*, the defendant was elderly and vision- and hearing-impaired. (*Id.* at p. 94.) When officers executed a search warrant on his home, the defendant brandished a shotgun at them. (*Ibid.*) At trial, he testified he did not hear the verbal announcement and "had no idea that the intruders were police officers." (*Ibid.*) The defendant was denied an instruction that would have informed the jury that "[i]n considering the self-defense issues, [it] must take into account any sensory impairment the defendant had in determining how a reasonable person with such disabilities would

have acted." (*Id*. at pp. 98-99.) The appellate court concluded that the refusal to give the pinpoint instruction was error because it made "no sense, either in law or logic, to hold appellant to the standard of a reasonable person *with* normal eyesight and hearing." (*Id.* at p. 99.) The court explained that "[W]hat is 'apparent' to a reasonable person who can see and hear is not 'apparent' to a person who is blind and hearing impaired." (*Id.* at p. 100.) Accordingly, the *Mathews* court imported a rule of tort law and applied the reasonable person standard of "a reasonable person with a similar physical disability." (*Id*. at p. 99.)

   *Mathews* is of no assistance to Patino. Patino had no physical disability that prevented him from seeing and hearing the circumstances that surrounded him. Again, Patino's age, intelligence, and experience do not change the applicable reasonable person standard. (*People v. Jefferson*, *supra*, 119 Cal.App.4th at p. 519; *see People v. Castillo* (1987) 193 Cal.App.3d 119, 124 ["[m]ental deprivation, in fact, never has been considered an attribute of the reasonable man"].)

   Patino's reliance on *Humphrey*, *People v. Smith* (1907) 151 Cal. 619 (*Smith*), and *Sotelo-Urena* is equally unavailing. (*Humphrey*, *supra*, 13 Cal.4th at p. 1087; *Smith*, at pp. 626–628; *Sotelo-Urena*, *supra*, 4 Cal.App.5th at pp. 741-744.) In each of those cases, the jury was instructed with similar self-defense instructions to those given here. (*Humphrey*, at p. 1081 [regarding self-defense, "the jury was to consider what 'would appear to be necessary to a reasonable person in a similar situation and with similar knowledge.' "]; *Smith*, at p. 628 [considering "what a reasonable man in the position of the defendant would have done under the same conditions"]; *Sotelo-Urena*, at p. 745 [regarding self-defense, "the jury … was expressly instructed that, 'In evaluating the defendant's beliefs, consider all the circumstances as they were known and appeared to the defendant.' (CALCRIM No. 571.) In other words, the jury was to evaluate defendant's belief in the need to use lethal force from his perspective." (italics omitted)].) However, each of the trial courts *excluded relevant evidence* regarding

34.

whether the defendant's action was taken in reasonable self-defense. (*Humphrey*, at pp. 1084, 1087 [excluding some evidence of battered women's syndrome]; *Smith*, at pp. 626–628 [excluding evidence of the defendant's weakened physical condition]; *Sotelo-Urena*, at pp. 745-746 [excluding expert testimony on the impact of chronic homelessness on threat perception].) The reviewing courts found error in the exclusion of evidence, not in the "reasonable person" instruction given to the jury. (*Humphrey*, at pp. 1088-1089;[6] *Smith*, at p. 627; *Sotelo-Urena*, at p. 752.) No such exclusion of evidence took place here. Patino was not precluded from introducing evidence regarding his age, intelligence, or experience to support his defense of self-defense.

The standard for heat of passion theory of manslaughter is equally unaffected by defendant's age, intelligence, and experience. In order for a killing that is otherwise murder to be reduced to voluntary manslaughter because the defendant acted in the heat of passion, the jury must determine that an " ' "ordinary [person] of average disposition" ' " in the same situation and knowing the same facts would act " ' "rashly or without due deliberation and reflection, and from this passion rather than from judgment." ' " (*Breverman*, *supra*, 19 Cal.4th at p. 163; see *People v. Beltran* (2013) 56 Cal.4th 935, 954 & fn. 14.) Even when a minor has advanced a heat of passion defense, courts apply the "ordinary [person of] average disposition" standard, not an ordinary minor standard. (*In re Thomas C.* (1986) 183 Cal.App.3d 786, 798, italics omitted.) A particularly immature or inexperienced defendant is not permitted to "set up his own standard of conduct." (*Ibid*.) If an easily provoked defendant is actually provoked and

---

**6** In *Humphrey*, a different instructional error arose regarding whether evidence of battered women's syndrome was relevant to both the defendant's subjective perception of danger and whether she acted reasonably. (*Humphrey*, 13 Cal.4th at pp. 1085-1086.) That instructional error led to erroneous exclusion of evidence. (*Id.* at pp. 1088-1089.) That issue does not affect the question before us.

kills another, but a reasonable person of average disposition in his position would not be provoked, the killing is murder, not manslaughter. (See *ibid*.)

We find no error in the self-defense and heat of passion instructions as given. Accordingly, Patino's substantial rights were not affected.

### E. Harmless Error and Absence of Prejudice

The People argue that even if the claim was not forfeited and the trial court erred in failing to sua sponte instruct the jury to consider Patino's age, intelligence, and experience, and even if defense counsel's performance was deficient for failing to seek such instruction, the error was harmless and counsel's performance caused no prejudice. We agree. Even if the instructions had been amplified to include instruction that the jury must consider Patino's age, intelligence, and experience, the outcome would not have been different.

Patino argues we should review the prejudice of the alleged error under the standard of *Chapman*, *supra*, 386 U.S. 18. An instructional error that "relieves the prosecution of the burden of proving beyond a reasonable doubt each essential element of the charged offense, or that improperly describes or omits an element of an offense" requires *Chapman* harmless error review. (*People v. Larsen* (2012) 205 Cal.App.4th 810, 829.) However, because pinpoint instruction and amplification of an instruction merely relate particular facts to legal issues in the case, the failure to give such an instruction is reviewed for prejudice under the *People v. Watson* (1956) 46 Cal.2d 818 (*Watson*) harmless error standard. (*People v. Larsen*, at p. 830.) Under *Watson*, reversal is required only if "it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*Watson*, at p. 836.)

Under either standard, any error in failing to amplify the self-defense instruction was harmless here because the jury rejected both that Patino subjectively believed he needed to defend himself with deadly force and that an objectively reasonable person in Patino's position would have felt the need to use deadly force to defend themself. The

36.

jury was instructed on imperfect self-defense with CALCRIM No. 571. In order for a killing that is otherwise murder to be reduced to voluntary manslaughter, a jury must find that the defendant "actually believed that he was in imminent danger of being killed or suffering great bodily injury" and "actually believed that the immediate use of deadly force was necessary to defend against the danger," but "[a]t least one of those beliefs was unreasonable." (CALCRIM No. 571; see *People v. Elmore* (2014) 59 Cal.4th 121, 134.) Here, the jury rejected Patino's imperfect self-defense theory. The jury therefore necessarily found that Patino did not actually believe (1) he was in imminent danger of being killed or suffering great bodily injury, and/or (2) imminent use of deadly force was necessary to defend against the danger. Because the jury concluded Patino did not subjectively believe that he was in imminent danger and/or that imminent use of deadly force was necessary, whether such a belief would have been reasonable for purposes of perfect self-defense was irrelevant and, we conclude beyond a reasonable doubt, could not have affected the outcome.

The failure to amplify both instructions was also harmless beyond a reasonable doubt because no evidence was submitted to suggest that Patino's age, intelligence, or experiences caused him to perceive danger differently or act differently than a reasonable person in the same situation. Indeed, defense counsel made no reference to Patino's age, intelligence, or experience at all in his closing argument. Accordingly, even if the trial court erred in not instructing the jury to consider Patino's age, intelligence, and experience in determining whether he reasonably perceived a need to use deadly force in self-defense and in determining whether a reasonable person of average disposition would have been provoked to use deadly force, we conclude beyond a reasonable doubt that Patino would have received no better outcome absent such error.

Because any instructional error was harmless beyond a reasonable doubt, Patino suffered no prejudice from defense counsel's failure to request amplification of the instructions or object to the trial court's failure to instruct sua sponte. (*Coffman and*

37.

*Marlow*, *supra*, 34 Cal.4th at p. 66; *People v. Mateo* (2016) 243 Cal.App.4th 1063, 1076.)  We reject Patino's ineffective assistance of counsel claim on that basis.  (*People v. Johnson* (1992) 3 Cal.4th 1183, 1227.)

## III.    General and Specific Intent Instructions

Patino contends the trial court's removal of the definitions of specific and general intent from CALCRIM No. 252 was reversable error because it lowered the prosecutor's burden of proof on murder, voluntary manslaughter, the alleged special circumstance, and the firearm and gang allegations, all of which required proof of specific intent.  The People respond that Patino forfeited the argument by failing to request clarifying language below.  Additionally, the People argue, the trial court did not err because the "other instructions adequately informed the jury regarding the requisite intents for each crime and allegation."

We agree with the People on both accounts.

### A.    Additional Background

The trial court instructed the jury with a modified version of CALCRIM No. 252:

> "The crimes and/or other allegations charged in Count 1 [murder] and 2 [possession of a firearm by a felon] require proof of the union or joint operation of act and wrongful intent[.]

> "The following crimes and allegations require general criminal intent:  Penal Code Section 29800[, subdivision] (a) (1)[.]

> "The following crimes and allegations require[] a specific intent or mental state:  Penal Code Section 187[, subdivision] (a), [m]urder, the lesser included offense of voluntarily manslaughter, and all enhancements and the special allegation[.]"  (See CALCRIM No. 252.)

Defense counsel did not request that the trial court instruct with the complete version of CALCRIM No. 252 or object to the given instruction.  The omitted portions of CALCRIM No. 252 included definitions of general and specific intent, and direction for

38.

the jury to refer to the instructions on the specific crimes or allegations for the prohibited act and any state of mind or mental state requirements. (CALCRIM No. 252.)

The trial court also instructed the jury on the charged crimes. On the murder count, the court instructed the jury that "the People must prove that: [¶] 1. The defendant committed an act that caused the death of another person; [¶] AND [¶] 2. When the defendant acted, he had a state of mind called malice aforethought; [¶] AND [¶] 3. He killed without lawful excuse or justification." (CALCRIM No. 520.) The court further instructed on the difference between express and implied malice for purposes of the murder count. (*Ibid*.) On the possession of a firearm by a felon count, the trial court instructed the jury that "the People must prove that: [¶] 1. The defendant possessed a firearm; [¶] 2. The defendant knew that he possessed the firearm; [¶] AND [¶] 3. The defendant had previously been convicted of a felony." (CALCRIM No. 2510.)

The trial court further instructed the jury regarding the special allegations. On the gang allegation, the trial court instructed that "the People must prove that: [¶] 1. The defendant committed the crime for the benefit of, at the direction of, or in association with a criminal street gang; [¶] AND [¶] 2. The defendant intended to assist, further, or promote criminal conduct by gang members." (CALCRIM No. 1401.) On the discharge of a firearm causing death allegation, the trial court instructed that "the People must prove that: [¶] 1. The defendant personally discharged a firearm during the commission of [the charged] crime; [¶] 2. The defendant intended to discharge the firearm; [¶] AND [¶] 3. The defendant's act caused the death of a person." (CALCRIM No. 3149.)

## B.    Forfeiture

The People contend that Patino forfeited this claim when he failed to object to the purported erroneous instruction. Patino acknowledges that no objection was made. His claim is therefore forfeited. (*Virgil*, *supra*, 51 Cal.4th at p. 1260.) Regardless, he contends his claim is reviewable because the purported error affected his substantial rights. (§ 1259.) Because, as we conclude below, the trial court's instructions were not

erroneous, his substantial rights were not affected. (*Andersen*, *supra*, 26 Cal.App.4th at p. 1249.)

### C. Sufficiency of the Instructions

Patino argues that the trial court's removal of the definitions of specific and general intent from CALCRIM No. 252 "lessened the prosecution's burden of proof" on all of the charged offenses and special allegations. The People contend that the instructions on the crimes and special allegations informed the jury of the actual intent required for the particular offenses. The People are correct.

Our Supreme Court considered virtually the same argument in *People v. Alvarez* (1996) 14 Cal.4th 155, 220. In *Alvarez*, the specific intent instruction given failed to identify murder as a specific intent crime. (*Ibid.*) Our Supreme Court found it was error not to identify murder as a specific intent crime, but the error was harmless because "[the] instruction on murder substantially covered the concurrence of act and 'specific intent.' " (*Ibid.*) By instructing on express and implied malice, the murder instruction advised the jury of the appropriate intent requirement. (*Ibid.*; see *People v. Rogers* (2006) 39 Cal.4th 826, 874-875.) The same is true here. Indeed, part of the omitted portion of CALCRIM No. 252 would have directed the jury to the instructions on each of the specific crimes and allegations for explanation of the intent requirements. (CALCRIM No. 252 ["The act and the specific (intent/ [and/or] mental state) required are explained in the instruction for that crime [or allegation]."].)

Likewise, the instructions on the crime of possession of a firearm as a felon, the special allegation of commission of a crime for the benefit of a criminal street gang, and the special allegation of discharge of a firearm causing death each explained the relevant state of mind requirements. (CALCRIM Nos. 2510 [defendant knowingly possessed a firearm], 1401 [defendant intended to "assist, further, or promote criminal conduct by gang members"], 3149 [defendant intended to discharge a firearm].)

In light of all of the instructions, taken as a whole, there is no reasonable likelihood that the jury misunderstood the intent requirements for any of the crimes of conviction or special allegations that the jury found true.

## IV.     Cumulative Error

Patino argues that the purported errors discussed in sections I, II, and III of the Discussion, *ante*, even if separately harmless, were together prejudicial.  Because we find error only on Patino's first claim, we reject Patino's contention that the judgment must be reversed for cumulative error.  (*People v. Vieira* (2005) 35 Cal.4th 264, 294.)

## **DISPOSITION**

The judgment is affirmed.


SMITH, J.

WE CONCUR:


POOCHIGIAN, Acting P.J.


DETJEN, J.